**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re the Matter of the Search of | No. 09-35096 |
| THE PREMISES LOCATED AT 840 140TH AVENUE NE, BELLEVUE, WASHINGTON, | D.C. No. 08-CV-01402-JLR |
| | OPINION |
| and | |
| In re | |
| REQUEST FROM THE RUSSIAN FEDERATION PURSUANT TO THE TREATY BETWEEN THE UNITED, STATES OF AMERICA AND THE RUSSIAN FEDERATION ON MUTUAL ASSISTANCE IN CRIMINAL MATTERS IN THE MATTER OF ARKADI A. GONTMAKHER. | |
| UNITED STATES OF AMERICA, | |
| Petitioner - Appellee, | |
| v. | |
| GLOBAL FISHING, INC.; and ARKADI A. GONTMAKHER, | |
| Respondents - Appellants. | |



Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted July 14, 2010
Seattle, Washington

Before: REINHARDT, GRABER, and PAEZ, Circuit Judges.

Opinion by Judge Graber

GRABER, Circuit Judge:

The Russian government sought the aid of the United States government, pursuant to a bilateral treaty, in its criminal investigation and prosecution of Appellant Arkadi A. Gontmakher for illegal crabbing. The district court issued a subpoena for certain documents in the possession of Appellant Global Fishing, Inc. Appellants moved for a protective order that effectively would have quashed the subpoena, arguing that the Russian government's investigation and prosecution of Gontmakher were corrupt and illegal. The district court denied the motion, and we affirm.

## FACTUAL AND PROCEDURAL HISTORY

Congress long ago authorized parties to request legal assistance from the federal courts in the collection of evidence for use in a foreign proceeding.

Originally enacted in the mid-19th century, the statute now codified at 28 U.S.C.

§ 1782 permits federal courts to provide such assistance.  See, e.g., Intel Corp. v.

Advanced Micro Devices, Inc., 542 U.S. 241, 247–49 (2004) (discussing the

history of the statute at some length).  Section 1782, in its current form, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.  By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement.  The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.
>
> A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

28 U.S.C. § 1782(a).

To invoke § 1782 and obtain federal-court assistance, the requesting entity

presents a written request known as a "letter rogatory" (or, if presented by an

"interested person," known as a "letter of request") to the applicable federal district court. See generally In re Comm'r's Subpoenas, 325 F.3d 1287, 1290 (11th Cir. 2003), abrogation in other part recognized by In re Clerici, 481 F.3d 1324, 1333 n.12 (11th Cir. 2007). As it works today, both foreign governments and private parties, including corporations and natural persons, can make requests for use in both underlying civil lawsuits and underlying criminal prosecutions. See, e.g., Intel, 542 U.S. at 246 (request by private corporation for use in underlying civil lawsuit); In re Letter of Request from Crown Prosecution Serv. of United Kingdom, 870 F.2d 686, 687 (D.C. Cir. 1989) (request by foreign government for use in underlying criminal investigation).

Over the years, the courts have interpreted § 1782 as imposing certain absolute requirements on the request for assistance. For instance, courts interpreted an earlier version of the statute to require that the foreign nation be a party to the proceeding. Intel, 542 U.S. at 248. In the 20th century, Congress amended the statute several times, each time removing more of the absolute restrictions on the courts' ability to provide assistance. See, e.g., id. at 247–48 ("In 1948, Congress substantially broadened the scope of assistance federal courts could provide for foreign proceedings."); United States v. Sealed 1, Letter of Request for Legal Assistance from Deputy Prosecutor Gen. of Russian Fed'n, 235

4

F.3d 1200, 1203–05 (9th Cir. 2000) (discussing the broadening effect of the 1948, 1949, 1964, and 1996 amendments).

One of the important congressional purposes in broadening the scope of federal-court assistance was to encourage reciprocity by other nations. See, e.g., United Kingdom, 870 F.2d at 690 ("[T]he expectation or hope was that by making assistance generously available through the good offices of United States officials and courts, our country would set an example foreign courts and authorities could follow when asked to render aid to United States courts, authorities, and litigators."); John Deere Ltd. v. Sperry Corp., 754 F.2d 132, 135 (3d Cir. 1985) ("'It is hoped that the initiative taken by the United States in improving its procedures will invite foreign countries similarly to adjust their procedures.'" (quoting the Senate Report for the 1964 amendment)). By providing broad assistance to foreign nations and tribunals via § 1782, the United States encourages foreign nations and tribunals to do the same, which benefits the United States government.

The absolute requirements under § 1782 are only part of the story, however. The courts have stressed that, even if those requirements are met, a district court still retains the discretion to deny a request. See, e.g., Intel, 542 U.S. at 264 ("As earlier emphasized, a district court is not required to grant a § 1782(a) discovery

5

application simply because it has the authority to do so." (citation omitted)).

"Congress gave the federal district courts broad discretion to determine whether, and to what extent, to honor a request for assistance under 28 U.S.C. § 1782." Four Pillars Enters. Co. v. Avery Dennison Corp., 308 F.3d 1075, 1078 (9th Cir. 2002); accord In re Clerici, 481 F.3d at 1331; Edelman v. Taittinger (In re Edelman), 295 F.3d 171, 181 (2d Cir. 2002); Al Fayed v. United States, 210 F.3d 421, 424 (4th Cir. 2000). The courts have described a wide range of potentially applicable factors to consider in making that discretionary determination. See, e.g., In re Request for Assistance from Ministry of Legal Affairs of Trinidad & Tobago, 848 F.2d 1151, 1156 (11th Cir. 1988) (holding that the district court should deny the request if the district court "suspects that the request is a 'fishing expedition' or a vehicle for harassment"), abrogated in other part by Intel, 542 U.S. at 259. The Supreme Court has held that those factors include whether "the person from whom discovery is sought is a participant in the foreign proceeding"; "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the

6

United States"; and whether the request is "unduly intrusive or burdensome."  Intel,

542 U.S. at 264–65.

In recent decades, the United States has ratified an increasing number of

bilateral treaties with other nations to facilitate legal proceedings, known as mutual

legal assistance treaties or MLATs.  See, e.g., In re Comm'r's Subpoenas, 325 F.3d

at 1290 (discussing an MLAT with Canada, ratified in 1989); United States v.

Erato (In re Subpoena Issued to Erato), 2 F.3d 11 (2d Cir. 1993) (discussing an

MLAT with the Netherlands, signed in 1981); In re Request from Kasper-

Ansermet, 132 F.R.D. 622 (D.N.J. 1990) (discussing an MLAT with Switzerland,

ratified in 1976).[1]  As their names suggest, these treaties provide for bilateral,

mutual assistance in the gathering of legal evidence for use by the requesting state

in criminal investigations and proceedings.  Viewed through the lens of reciprocity,

MLATs represent a direct approach to achieving reciprocity with other nations, in

addition to the indirect approach taken by congressional expansion of the scope of

§ 1782.  The ratification of MLATs in recent decades can be seen as yet another

step toward the goal of greater legal assistance by, and for, other nations, at least

---

[1] The parties have also directed our attention to MLATs with the Phillippines (ratified in 1994), Mexico (ratified in 1987), and Italy (ratified in 1982).

with respect to requests by foreign governments for use in underlying criminal investigations and proceedings.

At issue here is the MLAT between the United States and Russia, which entered into force after ratification by both parties in 2002. Treaty Between the United States of America and the Russian Federation on Mutual Legal Assistance in Criminal Matters ("US-Russia MLAT"), June 17, 1999, S. Treaty Doc. No. 106-22. In general, the treaty provides that, upon request, the two nations will provide "comprehensive mutual legal assistance in criminal matters." US-Russia MLAT, art. 1, ¶ 1. Legal assistance includes "providing documents, records, and other items." Id. art. 2(2). The treaty specifies that the receiving party "shall promptly execute the request," id. art. 7, ¶ 1, and that "[t]he competent authorities of the Requested Party shall have the authority to issue subpoenas, search warrants, or other orders necessary for the execution of requests," id. art. 7, ¶ 3.

In December 2007, the Russian government requested legal assistance from the United States pursuant to the US-Russia MLAT. The request concerned the Russian government's criminal investigation and prosecution of Appellant Gontmakher, a United States citizen and president of Appellant Global Fishing. In September 2007, Russian authorities had arrested Gontmakher in Moscow, filed criminal charges against him in Moscow City Court, and detained him pursuant to

8

those charges.  Pertinent to this appeal, the Russian government's request for legal assistance included the production of certain documents then in the possession of Global Fishing.

The United States government applied to the district court for the appointment of co-commissioners to execute the request for legal assistance.  The United States government petitioned the court "pursuant to Article 7 of the [MLAT], 28 U.S.C. § 1782, and the Court's own inherent authority" to appoint two named co-commissioners "to collect evidence from witnesses and to take such other action as is required to execute the attached request from Russia made pursuant to said Treaty."  That attached request details the many pieces of evidence sought by Russia.  The district court granted the application and appointed co-commissioners from the United States Attorney's office.

In August 2008, the commissioners subpoenaed Global Fishing to produce the documents.[2]  Appellants moved for a protective order.  Appellants urged the district court to quash the subpoena pursuant to its discretionary authority under 28 U.S.C. § 1782.  Specifically, they argued that "the Court should enter a protective

---

[2] The same day, the United States Attorney's office also subpoenaed Global Fishing to produce the identical documents on behalf of a domestic grand jury, in furtherance of a criminal investigation by the United States.  Global Fishing's compliance with that subpoena is not at issue in this appeal.

order relieving Global [Fishing] of any obligation to produce documents for use in the Russian investigation." They contended that the Russian proceedings are corrupt and illegal in a variety of ways, both in general and with respect to the specific proceedings against Gontmakher. Appellants argued that, because the United States invoked § 1782, the district court retained its usual broad discretion to deny the request for assistance.

The United States countered that, because the request for assistance arose under the US-Russia MLAT and not directly under § 1782, the district court lacked discretion to quash the subpoena. According to the United States, the US-Russia MLAT superseded the substantive aspects of § 1782, including the district court's "broad discretion" to deny requests.

After hearing oral argument, the district court denied the motion for a protective order. The court held that it lacked discretion under § 1782 but that the subpoena nevertheless must meet minimum constitutional standards. The court held that the request here did not offend the United States Constitution and therefore denied the motion for a protective order. Appellants timely appeal.

DISCUSSION

A.     Appellate Jurisdiction Over the District Court's Order

10

Before reaching the parties' arguments on the merits, we must determine whether we have jurisdiction. We have appellate jurisdiction over the district court's order denying the motion for a protective order only if the order is "final" under 28 U.S.C. § 1291.

In the domestic criminal context, we lack interlocutory appellate jurisdiction over an order denying a motion to quash a subpoena, because the order is non-final. Silva v. U.S. Dist. Court (In re Grand Jury Subpoena Issued to Bailin), 51 F.3d 203, 205 (9th Cir. 1995). "In order to appeal the order, the person subpoenaed must refuse to comply and contest the validity of the subpoena by appealing a contempt determination." Id. The person subpoenaed undoubtedly faces a difficult choice—comply and lose the right to appeal, or refuse to comply and possibly suffer contempt sanctions. But the Supreme Court has "consistently held that the necessity for expedition in the administration of the criminal law justifies" that rule. United States v. Ryan, 402 U.S. 530, 533 (1971) (citing Cobbledick v. United States, 309 U.S. 323 (1940); Alexander v. United States, 201 U.S. 117 (1906)). Balancing the witness' interest with the need for expedition in the underlying criminal case, the Court has held that the witness' ability to force review by refusing to comply with the subpoena "is adequate for his protection

11

without unduly impeding the progress of the [underlying criminal] case."

Cobbledick, 309 U.S. at 327 (quoting Alexander, 201 U.S. at 121).

But there is an important difference between an appeal from an order concerning an ongoing domestic criminal case and an appeal from an order concerning a request under the procedural mechanism of 28 U.S.C. § 1782.[3]  In a domestic criminal appeal, the district court's order enforcing a subpoena is but one step toward the ultimate resolution of the underlying criminal case; it is not the "final" step taken by the district court in that criminal case.  In a § 1782 appeal, however, the district court's subpoena order is the district court's last, or "final," order because, critically, the underlying case in a § 1782 appeal necessarily is conducted in a foreign tribunal.  Once the district court has ruled on the parties' motions concerning the evidentiary requests, there is no further case or controversy before the district court.

---

[3] Although this case involves an order issued under both the US-Russia MLAT and 28 U.S.C. § 1782, we see no difference, for purposes of finality, between a request arising under both an MLAT and § 1782, as compared to a request arising under § 1782 only.  The treaty does not speak to whether a district court's order is final for purposes of appellate jurisdiction.  Stated differently, the government concedes that it obtained the subpoena by invoking the procedural mechanism of § 1782, and we view the finality analysis as a procedural question, not a substantive one.

12

For that reason, the courts have permitted appeals from a district court's orders under § 1782, even if the complaining party has not subjected himself or herself to contempt sanctions. The Third Circuit succinctly explained in Bayer AG v. Betachem, Inc., 173 F.3d 188, 189 n.1 (3d Cir. 1999): "Only the discovery dispute under 28 U.S.C. § 1782 is occurring in the United States. Therefore, because the underlying litigation is in [a foreign court], this discovery order is immediately appealable." In In re Letters Rogatory Issued by Director of Inspection of Government of India, 385 F.2d 1017, 1018 (2d Cir. 1967), Judge Friendly explained for the Second Circuit that—like an order enforcing the subpoenas of independent administrative agencies, an order granting a subpoena in aid of an extradition proceeding, and an order to appear before the Internal Revenue Service—an order pursuant to § 1782 is final and appealable. "The distinction between such cases and the Alexander-Cobbledick line of authority is that in these instances the proceeding before the district court to compel testimony stands separate from the main controversy." Id.; see also Kestrel Coal Pty. Ltd. v. Joy Global Inc., 362 F.3d 401, 403 (7th Cir. 2004) ("Orders [issued under § 1782], like orders enforcing subpoenas, are final and appealable because they dispose of all issues in the proceeding.").

13

Our sister circuits have ruled that they have appellate jurisdiction over orders issued under § 1782 without qualification or exception. Phillips v. Beierwaltes, 466 F.3d 1217, 1220 (10th Cir. 2006); Foden v. Gianoli Aldunate (In re Application of Gianoli Aldunate), 3 F.3d 54, 57 (2d Cir. 1993); Janssen v. Belding-Corticelli, Ltd., 84 F.2d 577, 578 (3d Cir. 1936); see also Weber v. Finker, 554 F.3d 1379, 1385 (11th Cir.) (noting, but not reaching, the argument that "a Motion to Compel under § 1782 is a final, dispositive order because, although there is an ongoing action in a foreign tribunal, the Motion to Compel is the final order to be issued by the United States court"), cert. denied, 130 S. Ct. 59 (2009). Our sister circuits also have held that they have appellate jurisdiction over the district court's denial of a motion to quash even when the subject of the subpoena in the federal case also happens to be a party in the underlying foreign litigation. Kestrel Coal, 362 F.3d at 403; Foden, 3 F.3d at 56–57.

Our own jurisprudence is less absolute. In most cases, we have simply stated, without clarification or explanation, that we have appellate jurisdiction. Sealed 1, 235 F.3d at 1203; Advanced Micro Devices, Inc. v. Intel Corp., 292 F.3d 664, 666 (9th Cir. 2002); Okubo v. Reynolds (In re Letters Rogatory from Tokyo Dist. Prosecutor's Office), 16 F.3d 1016, 1018 n.1 (9th Cir. 1994); In re Kevork,

14

788 F.2d 566, 569 (9th Cir. 1986); see also Four Pillars, 308 F.3d at 1078 (exercising jurisdiction without explanation).

In a little-cited case decided in 1974, however, we held that, when the subject of the subpoena in the federal case is also a party to the foreign litigation, the rule from the domestic criminal context applies:  Appellate jurisdiction lies only if the interested party suffers contempt.  In re Letters Rogatory from Haugesund, Norway, 497 F.2d 378, 380–81 (9th Cir. 1974).  We explained a few years later, in In re Request for Judicial Assistance from Seoul District Criminal Court, 555 F.2d 720, 722 (9th Cir. 1977), that the exception announced in Haugesund is narrow:  We have appellate jurisdiction so long as the appellant in the federal case is not the interested party in the underlying foreign proceeding.  Although the government had not challenged our jurisdiction in Seoul, we felt compelled to explain:  "Haugesund, however, is inapplicable because the order there was directed against a party to the suit in Norway for which the letter rogatory was issued.  Here, the subpoena is directed against a bank, not the appellant who is the party of interest in the proceeding before the foreign tribunal."  Id.

Here, the subject of the subpoena is Global Fishing, which is not a party to the underlying criminal case in Russia against Gontmakher.  A corporation is a

15

separate legal entity from its employees, including its president.  See, e.g.,

Abrahim & Sons Enters. v. Equilon Enters., LLC, 292 F.3d 958, 962 (9th Cir.

2002).  The narrow Haugesund exception therefore does not apply.  We reject the

government's argument that we should extend the Haugesund exception to these

circumstances simply because Gontmakher is the president of Global Fishing and

thus Global Fishing has some abstract interest in the Russian criminal proceeding.

Given our narrow interpretation of the Haugesund exception in Seoul, the fact that

we have not mentioned the exception in more than three decades, and the fact that

no other circuit court even recognizes the exception, we are disinclined to expand

its scope here.  Accordingly, we hold that we have appellate jurisdiction over the

district court's order denying the motion for a protective order.[4]

B.      Federal Court Review of Requests under § 1782 and the US-Russia
        MLAT

---

[4] We also hold that this appeal is not moot.  See Betker v. U.S. Trust Corp. (In re Heritage Bond Litig.), 546 F.3d 667, 675 (9th Cir. 2008) ("The party asserting mootness bears a heavy burden of establishing that there is no effective relief remaining for a court to provide." (alteration and internal quotation marks omitted)).  Although Global Fishing has complied with the subpoena in part, its lawyer has stated to us that it continues to search its voluminous electronic files for documents responsive to the subpoena.  Reversing the district court's ruling would provide some effective relief to Global Fishing, because its ongoing document review could cease.

The parties offer contrasting views on the proper scope of federal court review in situations such as this one, in which the executive branch has requested assistance under both § 1782 and the US-Russia MLAT. Appellants contend that, as with any request under § 1782, the district court must exercise its "broad discretion" to honor or to deny a request for assistance, Four Pillars, 308 F.3d at 1078, including consideration of the factors discussed by the Supreme Court in Intel, 542 U.S. at 264. The MLAT is a self-executing treaty which, upon ratification, required no implementing legislation to take effect within the United States. A ratified self-executing treaty generally stands on the same footing as a federal statute, that is, a later-in-time self-executing treaty has the same effect on an existing federal statute as a later-in-time act of Congress. See Medellin v. Texas, 552 U.S. 491, 509 n.5 & 518 (2008) (holding that a later-in-time self-executing treaty supersedes a federal statute and that a later-in-time federal statute supersedes a treaty). In Appellants' view, however, nothing in the MLAT superseded the requirement that district courts must exercise their broad discretion.

The government offers a different interpretation of the MLAT. In the government's view, although the US-Russia MLAT incorporated the procedural mechanism of § 1782 to carry out requests for assistance via the federal courts, the treaty superseded all the substantive aspects of § 1782, including the discretionary

17

factors discussed by the Supreme Court in Intel.  The government argues that the only substantive limitations on a request originating under the US-Russia MLAT are the limitations defined by the treaty itself.  Accordingly, the federal courts must execute requests for assistance without consideration of the § 1782 discretionary factors.

We therefore must determine whether the treaty superseded the statute's grant of discretionary authority to the district courts.  See Cont'l Ins. Co. v. Fed. Express Corp., 454 F.3d 951, 954 (9th Cir. 2006) (holding that we review de novo the interpretation of a treaty).  "'The interpretation of a treaty, like the interpretation of a statute, begins with its text.'"  Abbott v. Abbott, 130 S. Ct. 1983, 1990 (2010) (quoting Medellin, 552 U.S. at 506).  "If the plain text is ambiguous, we look to other sources to elucidate the treaty's meaning, including the purposes of the treaty, its drafting history, the postratification understanding of the contracting parties and the decisions of the courts of other signatories."  Hosaka v. United Airlines, Inc., 305 F.3d 989, 993–94 (9th Cir. 2002) (citation omitted) (citing El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 167–76 (1999)).  "Throughout, 'it is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties.'"  Id. at 994 (quoting Air France v. Saks, 470 U.S. 392, 399 (1985)).

18

Neither Appellants nor the government asserts that the meaning of the MLAT's text is plain. We agree that there is no plain meaning here. Although the text of some provisions provides mild support for one interpretation or the other, no provision addresses, or even purports to address, the question disputed here—the scope of federal court review of MLAT requests. The closest provision in this regard is the first sentence of Article 7, paragraph 3, which states: "Requests shall be executed in accordance with the laws of the Requested Party except if this Treaty provides otherwise." But that sentence is ambiguous. The phrase "executed in accordance with the laws of the Requested Party" could mean "subject to the procedural mechanisms and substantive limitations of the laws of the Requested Party." Or, at least as plausibly, the phrase could mean only "carried out in accordance with the procedural mechanisms of the Requested Party." The term "executed" suggests a procedural mechanism only, see Black's Law Dictionary 567 (6th ed. 1990) (defining "execute" as, in part, "to carry out according to its terms"), but its meaning in context is far from plain. We turn, then, to other indicators of the treaty parties' intent, nearly all of which strongly support the government's interpretation.

    1.    <u>Deference to the Executive Branch</u>

19

"It is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'" Abbott, 130 S. Ct. at 1993 (quoting Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 185 (1982)). In addition to being entitled to "great weight," the government's reasonable interpretation of this treaty also finds strong support in a common-sense argument concerning the intent of the treaty parties. The § 1782 process has always been available to the Russian government. If the treaty maintains the same substantive limitations as § 1782, then the Russian government had little to gain by agreeing to the treaty, and the treaty would accomplish much less under Appellants' view than under the government's view. In other words, it seems unlikely that the parties to the treaty intended that requests for assistance would be subject, as before, to the same discretionary factors under § 1782.

2.    Harmony in Results

We have adopted the view of the Restatement (Third) of Foreign Relations Law § 325 cmt. d (1987) that "[t]reaties that lay down rules to be enforced by the parties through their internal courts or administrative agencies should be construed so as to achieve uniformity of result despite differences between national legal systems." See United States v. Lombera-Camorlinga, 206 F.3d 882, 888 (9th Cir. 2000) (en banc) ("By refusing to adopt an exclusionary rule, we thus promote

20

harmony in the interpretation of an international agreement." (citing Restatement (Third) of Foreign Relations Law § 325 cmt. d)).  Here, the parties agree that the Russian government does not have an analog to § 1782; the Russian courts have not been vested with discretionary authority to deny a request for assistance.  The government's view therefore supports "harmony in the interpretation" of the MLAT, whereas Appellants' view creates discord.

      3.     <u>Technical Analysis</u>

The technical analysis of the treaty that the United States Department of Justice and Department of State prepared, which the President submitted to the Senate at the same time that he asked for the Senate's ratification, supports the government's view.  <u>See</u> <u>In re Comm'r's Subpoenas</u>, 325 F.3d at 1297–98 (referring to a technical analysis in interpreting a treaty); <u>United States v. Davis</u>, 767 F.2d 1025, 1029–30 (2d Cir. 1985) (same).  The technical analysis does not address the issue of the procedure/substance distinction directly.  But several parts of the technical analysis suggest that the government's view is correct.  For instance, the first page states that "[i]t is anticipated that the Treaty will be implemented in the United States pursuant <u>to the procedural framework</u> provided by Title 28, United States Code, Section 1782."  (Emphasis added.)  As another example, in footnote 2, the technical analysis discusses a particular substantive

21

point and concludes that "this paragraph [of the Treaty] accords the courts broader authority to execute requests than does Title 28, United States Code, Section 1782, as interpreted [by some courts]." That part of the analysis makes sense only if the authors viewed the treaty as expanding the ability of Russia to obtain judicial assistance beyond the reach of requests under § 1782. The same is true of the technical analysis' discussion of Article 10, paragraph 3, where the authors note that "[t]his is consistent with the approach taken in Title 28, United States Code, Section 1782." If the substantive provisions of § 1782 controlled, that statement would be meaningless.

4. Article 4 of the US-Russia MLAT

Consideration of Article 4 of the treaty strongly supports the government's view. That article specifies three—and only three—grounds for denying a request: an exception for military crimes, an exception for security or "other essential interests," and an exception for requests that do not conform to the treaty. The use of three specified reasons for denial in a closed list strongly suggests that those reasons are the only permissible reasons for denying a request under the treaty. Indeed, the technical analysis confirms that view: Article 4 "specifies the limited classes of cases in which assistance may be denied under the Treaty." Under Appellants' view, however, an additional, unstated basis for denial exists: United

22

States courts may choose to exercise their broad discretion to deny the request, evaluating a wide range of equitable considerations.  That view is hard to reconcile with the text of Article 4 and the technical analysis' straight-forward reading of that text.  Not only is that view hard to reconcile with the text, but it also could create tension with foreign affairs by effectively requiring the United States to deny a treaty request for a reason other than one specified in Article 4.

5.      Liberal Construction

A treaty "should generally be construed liberally to give effect to the purpose which animates it and . . . even where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred."  United States v. Stuart, 489 U.S. 353, 368 (1989) (alterations and internal quotation marks omitted).  Here, Article 1, paragraph 1, states:  "The Parties shall provide to each other, in accordance with this Treaty, comprehensive mutual legal assistance in criminal matters."  The government's view "animates" the purpose of the treaty—comprehensive mutual legal assistance in criminal matters—whereas Appellants' view "restrict[s]" the "rights which may be claimed under it."  Stuart, 489 U.S. at 368.

6.      Our Sister Circuit's Interpretation

23

The Eleventh Circuit reached the same conclusion, for many of the same reasons, when it interpreted the US-Canada MLAT. In re Comm'r's Subpoena, 325 F.3d at 1292–1304. We find that court's conclusion equally applicable here:

> We conclude that the most logical construction of the . . . MLAT is that the Treaty partners intended to utilize the established procedures set forth in the existing laws of the Requested State to execute the treaty requests, rather than to subject each and every treaty request to any and all limitations of existing law of the Requested State. That is, the Treaty utilizes § 1782 as a procedure for executing requests, but not as a means for deciding whether or not to grant or deny a request so made.

Id. at 1297.

7.    Conclusion

Almost every indicator of the treaty-parties' intent favors the government's view. Appellants are correct that the treaty does not expressly specify the procedure/substance distinction. Appellants are also correct that such a distinction is an unusual method of interpreting a law. But, viewed in the larger context of the treaty, and with due deference to the executive branch, the government offers the more reasonable interpretation. We hold that requests for assistance via the US-Russia MLAT utilize the procedural mechanisms of § 1782 without importing the substantive limitations of § 1782. In particular, the parties to the treaty intended

24

that the district courts would not possess the normal "broad discretion," conferred by § 1782, to deny requests for assistance.

We cannot help but note that our conclusion may carry few practical implications. The § 1782 discretionary factors include, primarily, whether "the person from whom discovery is sought is a participant in the foreign proceeding"; "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and whether the request is "unduly intrusive or burdensome." Intel, 542 U.S. at 264–65. In the context of a request under the MLAT, however, almost all of those factors already were resolved by the executive branch of government when it signed the treaty and by the Senate when it ratified the treaty. For instance, the receptivity of the foreign government is clear, because it is the foreign government that is making the request. For the same reason, one knows that the request does not violate the policies of the foreign country. As for the factors that might still depend on the facts of the particular case, such as whether the request is burdensome, it is reasonable to conclude that the United States government effectively has weighed those factors by agreeing to the MLAT

and by agreeing to the particular request at issue. In this regard, it should be remembered that, before the request reaches the district court, it has proceeded through the executive branch, which has the right to deny the request for the reasons stated in the treaty and which has the right to request modifications in the event that the request is too burdensome.

In sum, many of the § 1782 discretionary factors would weigh automatically in favor of granting the request, and many would no longer require (or permit) consideration by the courts because they already have been considered by a co-equal branch of the United States government. When a request for assistance under the MLAT arrives before a district court, then, almost all the factors already would point to the conclusion that the district court should grant the request.

C. <u>Constitutional Limitations</u>

Our conclusion that the parties to the treaty intended to remove the district court's traditional "broad discretion" does not end the inquiry. The government argues that, upon receiving an MLAT request for assistance from the executive branch, the district court has no choice but to comply with that request. According to the government, the constitution imposes no limits on what the executive branch may require the courts to do in that situation. We disagree.

Treaties, like statutes, are subject to constitutional limits, including the separation of powers and the guarantee of due process. See Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 416 n.9 (2003) (holding that treaties are "[s]ubject . . . to the Constitution's guarantees of individual rights"); cf. United Kingdom, 870 F.2d at 693 n.8 (holding, in the context of a § 1782 request, that "[t]he district court's discretion is of course subject to the U.S. Constitution"). The enforcement of a subpoena is an exercise of judicial power. According to the government, the executive branch has the authority to exercise that power directly, because the district court is required, by virtue of an MLAT request, to compel the production of requested documents. The government's position leads to the inescapable and unacceptable conclusion that the executive branch, and not the judicial branch, would exercise judicial power. Alternatively, the government's position suggests that by ratifying an MLAT, the legislative branch could compel the judicial branch to reach a particular result—issuing orders compelling production and denying motions for protective orders—in particular cases, notwithstanding any concerns, such as violations of individual rights, that a federal court may have. This too would be unacceptable. Cf. United States v. Klein, 80 U.S. (13 Wall.) 128, 146–47 (1871).

27

The Constitution's separation of powers does not permit either the legislative or executive branch to convert the judicial branch into a mere functionary. Instead, the Constitution requires that "no provision of law 'impermissibly threaten[] the institutional integrity of the Judicial Branch.'" Mistretta v. United States, 488 U.S. 361, 383 (1989) (quoting Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 851 (1986)). At a minimum, that integrity requires that federal courts be able to consider constitutional challenges to the action they are requested to compel, and to refrain from participating in action that would violate the constitution. We therefore hold that, in the context of an MLAT request, a district court may not enforce a subpoena that would offend a constitutional guarantee.

We leave for another day the elucidation of the precise scope of applicable constitutional limits. For present purposes, we find it sufficient to describe certain broad outlines. At a minimum, the Constitution requires that a request not be honored if the sought-after information would be used in a foreign judicial proceeding that "depart[s] from our concepts of fundamental due process and fairness." Seoul, 555 F.2d at 724. But the Constitution does not require us to ensure that a foreign government offers the same protections as does our Constitution before assisting that government. Neely v. Henkel, 180 U.S. 109, 122–23 (1901); Kamrin v. United States, 725 F.2d 1225, 1228 (9th Cir. 1984). We

28

also think it clear that the Constitution does not mandate consideration of the various discretionary factors developed by the courts as reflecting congressional intent with respect to § 1782. Nothing in our case law suggests that Congress necessarily would offend the Constitution if it amended § 1782, as Congress has done repeatedly in the past century, to reduce the discretionary factors that the courts must consider. Both the § 1782 discretionary factors and the wide array of our own constitutional guarantees grant more than the minimum requirements of due process for purposes of granting assistance pursuant to an MLAT request.

We can conceive of situations in which the Constitution might require the district court to deny a request for assistance. For example, if credible evidence demonstrated that compliance with a subpoena would lead to an egregious violation of human rights, such as torture, then the Constitution may require the courts to deny assistance. The court's role in this context is limited, however, and must be tempered by the recognition that "the field of foreign affairs" is one that "the Constitution entrusts to the President and the Congress." Zschernig v. Miller, 389 U.S. 429, 432 (1968).

Here, Appellants assert that we must deny assistance for two reasons: First, the Russian system of criminal justice, in general, is corrupt. Second, the Russian government failed to observe certain time limits set by Russian law to investigate

and prosecute Gontmakher. Appellants do not argue that the production of documents itself will cause some egregious outcome. Rather, they argue that separation-of-powers and due-process concerns preclude the judicial branch from furthering these allegedly corrupt and illegal proceedings. Having reviewed the record, we are satisfied that the enforcement of the subpoena at issue here does not offend the Constitution.

The Constitution assigns to the political branches the primary responsibility of weighing general complaints about a nation's criminal justice system. By signing and ratifying the US-Russia MLAT, and by agreeing to honor Russia's request in this case, the political branches of our government have determined that the Russian system of criminal justice in general comports with minimum constitutional guarantees. We will not upset that decision on the basis of Appellants' broad unsupported allegations that the Russian criminal justice system as a whole is corrupt.

With respect to Appellants' complaints concerning the treatment of Gontmakher specifically, Appellants' arguments amount to no more than a complaint that, in their view, the Russian authorities have violated the Russian Code of Criminal Procedure by failing to produce evidence within a specified time period. Even assuming that their allegation is correct, granting the Russian

government's request for documents would not, for that reason alone, violate our Constitution's separation of powers or guarantee of due process. Just as a violation of state law does not necessarily offend our Constitution, Parle v. Runnels, 387 F.3d 1030, 1045 (9th Cir. 2004); Sweaney v. Ada County, 119 F.3d 1385, 1391 (9th Cir. 1997), so, too, a violation of foreign law does not necessarily offend our Constitution. Neither fundamental notions of due process and fairness nor separation-of-powers concerns are implicated by this alleged procedural violation of Russian law, which concerns timing only.

In conclusion, we hold that compliance with the Russian government's request for documents from Global Fishing does not offend the Constitution.

**AFFIRMED.**

COUNSEL

Angelo J. Calfo and Lyle A. Tenpenny, Yarmuth Wilsdon Calfo, PLLC, Seattle, Washington; Irwin H. Schwartz, Law Offices of Irwin H. Schwartz, Seattle, Washington; and David V. Marshall, Davis Wright Tremaine LLP, Seattle, Washington, for Respondents-Appellants.

James D. Oesterle and Michael S. Morgan, Assistant United States Attorneys, Seattle, Washington, for Petitioner-Appellee.