# United States Court of Appeals

## For the First Circuit

No. 11-2511

IN RE: REQUEST FROM THE UNITED KINGDOM PURSUANT TO THE TREATY
BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE
GOVERNMENT OF THE UNITED KINGDOM ON MUTUAL ASSISTANCE IN CRIMINAL
MATTERS IN THE MATTER OF DOLOURS PRICE

UNITED STATES,

Petitioner, Appellee,

v.

ED MOLONEY; ANTHONY McINTYRE,

Movants, Appellants.

No. 12-1159

ED MOLONEY; ANTHONY McINTYRE,

Plaintiffs, Appellants,

v.

ERIC H. HOLDER, JR., Attorney General;
JACK W. PIROZZOLO, Commissioner,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Boudin, Circuit Judges.

Eamonn Dornan, with whom Dornan & Associates PLLC and James J. Cotter III were on brief, for appellants.

Barbara Healy Smith, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, and John T. McNeil, Assistant United States Attorney, were on brief, for appellee.

—————————————————

July 6, 2012

—————————————————

**LYNCH, <u>Chief Judge</u>**.  These consolidated appeals are from the denial, in two cases, of the efforts of two academic researchers to prevent the execution of two sets of subpoenas issued in May and August of 2011.  The subpoenas were issued to Boston College ("BC") by a commissioner appointed pursuant to 18 U.S.C. § 3512 and the "US-UK MLAT," the mutual legal assistance treaty between the United States and the United Kingdom.  The subpoenas are part of an investigation by United Kingdom authorities into the 1972 abduction and death of Jean McConville, who was thought to have acted as an informer for the British authorities on the activities of republicans in Northern Ireland.  This appears to be the first court of appeals decision to deal with an MLAT and § 3512.

The May 2011 subpoenas sought oral history recordings and associated documentation from interviews BC researchers had conducted with two former members of the Irish Republican Army ("IRA"): Dolours Price and Brendan Hughes.  BC turned over the Hughes materials because he had died and so he had no confidentiality interests at stake.  BC moved to quash or modify the Price subpoenas.  The second set of subpoenas issued in August 2011 sought any information related to the death or abduction of McConville contained in any of the other interview materials held by BC.  BC moved to quash these subpoenas as well.

The district court denied both motions to quash. In re: Request from the U.K., 831 F. Supp. 2d 435 (D. Mass. 2011). And after undertaking in camera review of the subpoenaed materials it ordered production. Order, In re: Request from the U.K., No. 11-91078 (D. Mass. Dec. 27, 2011), ECF No. 38 (ordering production of Price interviews pursuant to May subpoenas); Findings and Order, In re: Request from the U.K., No. 11-91078, 2012 WL 194432 (D. Mass. Jan. 20, 2012) (ordering production of other interviews pursuant to August subpoenas). BC has appealed the order regarding the August subpoenas, but that appeal is not before this panel. BC chose not to appeal the order regarding the Price materials sought by the May subpoenas.

The appellants here, Ed Moloney and Anthony McIntyre, who unsuccessfully sought to intervene in BC's case on both sets of subpoenas, pursue in the first appeal a challenge to the district court's denial of their motions to intervene as of right and for permissive intervention. Their intervention complaint largely repeated the claims made by BC and sought declarations that the Attorney General's compliance with the United Kingdom's request violates the US-UK MLAT and injunctive relief or mandamus compelling him to comply with the terms of that treaty. The effect of the relief sought would be to impede the execution of the subpoenas.

-4-

Having lost on intervention, Moloney and McIntyre then filed their own original complaint, essentially making the same claims as made in this intervenor complaint. The district court dismissed the complaint, stating that even assuming the two had standing, the reasons it gave in its reported decision for denial of BC's arguments and denial of intervention applied to dismissal of the complaint. See Order of Dismissal, Moloney v. Holder, No. 11-12331 (D. Mass. Jan. 25, 2012), ECF No. 15; Tr. of Mot. Hr'g, Moloney v. Holder, No. 11-12331 (D. Mass. Jan. 24, 2012), ECF No. 18. Appellants freely admit that their complaint "essentially set forth the same claim" as their complaint in intervention. In the second appeal they challenge the dismissal of their separate civil complaint for lack of subject matter jurisdiction and for failure to state a claim.

I.

The factual background for these suits is not disputed.

A. The Belfast Project at Boston College

The Belfast Project ("the Project") began in 2001 under the sponsorship of BC. An oral history project, its goal was to document in taped interviews the recollections of members of the Provisional Irish Republican Army, the Provisional Sinn Fein, the Ulster Volunteer Force, and other paramilitary and political organizations involved in the "Troubles" in Northern Ireland from 1969 forward. The purpose was to gather and preserve the stories

of individual participants and provide insight into those who become personally engaged in violent conflict. The Project is housed at the John J. Burns Library of Rare Books and Special Collections at BC.

Against this background, the Project attempted to guard against unauthorized disclosure. The agreement between Moloney and BC directed him as Project Director to require interviewers and interviewees to sign a confidentiality agreement forbidding them from disclosing the existence or scope of the Project without the permission of BC. The agreement also required the use of a coding system to maintain the anonymity of interviewees and provided that only the Burns Librarian and Moloney would have access to the key identifying the interviewees. Although the interviews were originally going to be stored in Belfast, Northern Ireland, as well as Boston, the Project leadership ultimately decided that the interviews could only be safely stored in the United States. They

The Project was first proposed by appellant Ed Moloney, a journalist and writer. He later contracted with BC to become the Project's director. Before the Project started, Robert K. O'Neill, the Director of the Burns Library, informed Moloney that, although he had not yet conferred with counsel on the point, he could not guarantee that BC "would be in a position to refuse to turn over documents [from the Project] on a court order without being held in contempt."

Against this background, the Project attempted to guard against unauthorized disclosure. The agreement between Moloney and BC directed him as Project Director to require interviewers and interviewees to sign a confidentiality agreement forbidding them from disclosing the existence or scope of the Project without the permission of BC. The agreement also required the use of a coding system to maintain the anonymity of interviewees and provided that only the Burns Librarian and Moloney would have access to the key identifying the interviewees. Although the interviews were originally going to be stored in Belfast, Northern Ireland, as well as Boston, the Project leadership ultimately decided that the interviews could only be safely stored in the United States. They

were eventually stored in the "Treasure Room" of the Burns Library, with extremely limited access.

The agreement between Moloney and BC requires that "[e]ach interviewee is to be given a contract <u>guaranteeing to the extent American law allows</u> the conditions of the interview and the conditions of its deposit at the Burns Library, including terms of an embargo period if it becomes necessary" (emphasis added). The agreement, in this clause, expressly acknowledged that its protections could be limited by American law. The agreement also directs that the Project adopt an "appropriate user model, such as Columbia University's Oral History Research Office Guidelines statement."[1]

The Project employed researchers to interview former members of the Irish Republican Army and the Ulster Volunteer Force. Appellant Anthony McIntyre, himself a former IRA member, was one of those researchers. McIntyre worked for the Project under a contract governed by the terms of the agreement between Moloney and BC. McIntyre's contract required him to transcribe and index the interviews he conducted and to abide by the confidentiality requirements of the Moloney agreement. McIntyre conducted a total of twenty-six interviews of persons associated

---

[1] As the district court noted in its opinion, researchers for Columbia University's oral history projects apparently advise interviewees that whatever they say is subject to release under court orders and subpoenas. <u>See</u> <u>In re: Request from the U.K.</u>, 831 F. Supp. 2d 435, 441 n.4 (D. Mass. 2011).

with the republican side of the conflict for the Project by the time it ended in 2006. In addition, the Project contains interviews with fourteen members of Protestant paramilitary groups and one member of law enforcement. There are a total of forty-one interview series (each series may contain multiple interviews with a single person).

Interviewees entered into donation agreements with BC, which were signed by the interviewees and by O'Neill, the Burns Librarian. The donation agreements transfer possession of the interview recordings and transcripts to BC and assign to the school "absolute title" to the materials, "including whatever copyright" the interviewee may own in their contents. The donation agreements have the following clause regarding access to the interview materials:

> Access to the tapes and transcripts shall be restricted until after my death except in those cases where I have provided prior written approval for their use following consultation with the Burns Librarian, Boston College. Due to the sensitivity of content, the ultimate power of release shall rest with me. After my death the Burns Librarian of Boston College may exercise such power exclusively.

This clause does not contain the term "confidentiality" and provides only that access will be restricted. But it does recite that the ultimate power of release belongs to the donor during the donor's lifetime. The donation agreements do not contain the "to the extent American law allows" language that is contained in the

agreement between Moloney and BC.  A copy of the donation agreement for Brendan Hughes, but not one for Dolours Price, is in the record, but we assume both signed one.[2]

In 2010 Moloney published a book and released a documentary, both entitled "Voices from the Grave, Two Men's War in Ireland," based on Belfast Project interviews with Hughes and with David Ervine, a former member of the Ulster Volunteer Force.[3]  In addition, news reports in Northern Ireland revealed that Price had been interviewed by academics at a Boston-area university and that she had admitted to being involved in the murder and "disappearances" of four persons targeted by the IRA, including Jean McConville.

B.       The US-UK MLAT Subpoenas

On March 30, 2011, the United States submitted an application to the district court ex parte and under seal pursuant to the US-UK MLAT and 18 U.S.C. § 3512, seeking the appointment of an Assistant United States Attorney as commissioner to collect

---

[2]  An affidavit from McIntyre, who interviewed Price, states that Price did sign a donation agreement, which McIntyre states that he witnessed and also signed, and that he sent the donation form to BC.  The affidavit from O'Neill, the Burns Librarian, states that a search of the Project's archives for Price's executed donation agreement failed to locate it, but that there is no reason to doubt that Price did in fact execute a donation agreement just like the one executed by Hughes.

[3]  At the time the book was published, both Hughes and Ervine had died, so under the terms of their donation agreements their interviews could be released to the public.

evidence from witnesses and to take such other action as necessary to effectuate a request from law enforcement authorities in the United Kingdom.  That application remains under seal.  The application resulted from a formal request made by the United Kingdom, pursuant to the US-UK MLAT, for legal assistance in a pending criminal investigation in that country involving the 1972 murder and kidnapping of Jean McConville.  The district court granted the government's application on March 31, 2011, and entered a sealed order granting the requested appointment.

The commissioner issued two sets of subpoenas for Belfast Project materials.  The first set of subpoenas were received by BC on May 5, 2011, and were directed to the Trustees of Boston College; Robert K. O'Neill, Director of the Burns Library; and Thomas E. Hachey, Professor of History and Executive Director of the Center for Irish Studies at BC.  The subpoenas were issued for the purpose of assisting the United Kingdom "regarding an alleged violation of the laws of the United Kingdom," namely, murder, conspiracy to murder, incitement to murder, aggravated burglary, false imprisonment, kidnapping, and causing grievous bodily harm with intent to cause such harm.  The subpoenas did not state the identity of the victim or victims of these crimes, and sought recordings, written documents, written notes, and computer records of interviews made with Brendan Hughes and Dolours Price, to be produced on May 26, 2011.

BC produced responsive materials related to Hughes; the conditions of his donation agreement pertaining to the release of his interviews had terminated with his death. The time to produce the Price materials was extended by agreement with the U.S. Attorney's Office until June 2, 2011.

The second set of subpoenas were received by counsel for BC on August 4, 2011. The August subpoenas sought recordings of "any and all interviews containing information about the abduction and death of Mrs. Jean McConville," along with related transcripts, records, and other materials. The August subpoenas were directed at the 176 interviews with the remaining 24 republican-associated interviewees who were part of the Project. These subpoenas directed production no later than August 17, 2011.

C.      The Litigation Initiated by BC

On June 7, 2011, BC moved to quash the May subpoenas. In the alternative, BC requested that the court allow representatives from BC access to the documents that describe the purposes of the investigation to enable BC to specify with more particularity in what ways the subpoenas were overbroad or that the court conduct such a review in camera. The government opposed the motion. After receiving the August subpoenas, BC filed a new motion to quash addressed to both sets of subpoenas, which the government also opposed.

-11-

On August 31, 2011, appellants Moloney and McIntyre filed a motion to intervene as of right and for permissive intervention, see Fed. R. Civ. P. 24, along with their intervention complaint. That pleading tracked the arguments made in BC's motion to quash and also alleged that the Attorney General's compliance with the United Kingdom's request violated the US-UK MLAT and that enforcement of the subpoenas would violate Moloney and McIntyre's First and Fifth Amendment rights. Moloney and McIntyre sought declarations that the Attorney General was in violation of the US-UK MLAT and injunctive relief or mandamus compelling him to comply with the terms of that treaty, the effect of which would be to impede the execution of the subpoenas. The government opposed the motions to intervene.

On December 16, 2011, the district court issued an opinion denying BC's motions to quash the May and August subpoenas for the reasons stated in its opinion. In re: Request from the U.K., 831 F. Supp. 2d at 459. As to BC's alternative request, the court ordered BC to produce materials responsive to the two sets of subpoenas for the court to review in camera.[4] Id.

_____

[4] During a hearing held on December 22, 2011, the court explained that it would engage in a two-part analysis, first determining whether the produced materials fell within the scope of the subpoenas, and second engaging in a balancing test. See Tr. of Conf., In re: Request from the U.K., No. 11-91078 (D. Mass. Dec. 22, 2011), ECF No. 35.

The district court also denied Moloney and McIntyre's motion to intervene as of right and their motion for permissive intervention.  Id.  The court stated that no federal statute gave Moloney and McIntyre an unconditional right to intervene under Rule 24(a)(1), "and the US-UK MLAT prohibits them from challenging the Attorney General's decisions to pursue the MLAT request."[5]  Id. at 458.  The district court "conclude[d] that Boston College adequately represents any potential interests claimed by the Intervenors.  Boston College has already argued ably in favor of protecting Moloney, McIntyre and the interviewees."  Id.  The court did not separately analyze permissive intervention.  Moloney and McIntyre timely appealed the denial of their motion to intervene on December 29, 2011.

Having reviewed in camera the interviews of Dolours Price sought by the May subpoenas, the district court on December 27, 2011 ordered that the May subpoenas be enforced according to their terms.  See Order, In re: Request from the U.K., No. 11-91078 (D. Mass. Dec. 27, 2011), ECF No. 38.  BC and the other recipients of the May subpoenas did not appeal this order.[6]

_____

[5]  The district court also mentioned but did not analyze the rule that "[a]n interest that is too contingent or speculative . . . cannot furnish a basis for intervention as of right."  In re: Request from the U.K., 831 F. Supp. 2d at 458 (quoting Ungar v. Arafat, 634 F.3d 46, 50-51 (1st Cir. 2011)) (internal quotation marks omitted).

[6]  On December 30, 2011, this court granted Moloney and McIntyre's motion to stay the portion of the district court's order

-13-

Having been denied intervention, Moloney and McIntyre filed a separate civil complaint in the district court on December 29, 2011. The same legal theories were stated in this complaint as had been in the intervention complaint. The government moved to dismiss plaintiffs' separate complaint for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6).

The district court held a hearing on the motion to dismiss on January 24, 2012, and dismissed the case from the bench. See Tr. of Mot. Hr'g at 11, Moloney v. Holder, No. 11-12331 (D. Mass. Jan. 24, 2012), ECF No. 18. The district court "rule[d] that neither Mr. McIntyre nor Mr. Moloney under the Mutual Legal Assistance Treaty and its adoption by the [S]enate and the treaty materials has standing to bring this particular claim." Id. The district court also stated:

> Beyond that, on the merits, I am satisfied
> that the Attorney General as [a] matter of law
> has acted appropriately with respect to the
> steps he has taken under this treaty, and I
> can conceive of no different result applying
> the heightened scrutiny that I think is
> appropriate for these materials were this case
> to go forward on the merits.[7]

of December 27, 2011 permitting the government to turn over the Price interview materials to the United Kingdom, pending the resolution of this appeal.

[7] It is evident from the transcript of the hearing that the district court considered Moloney and McIntyre's constitutional claims as being the same as those raised by BC's motions to quash and that the court dismissed Moloney and McIntyre's claims for the

-14-

Id.  Moloney and McIntyre timely appealed the dismissal of their complaint on January 29, 2012.

As to BC's motion to quash the August subpoenas, on January 20, 2012, the district court ordered BC to produce to the government the full series of interviews and transcripts of five interviewees and two specific interviews (but not the full interview series) with two additional interviewees, along with transcripts and related records.[8]  See Findings and Order, In re: Request from the U.K., No. 11-91078, 2012 WL 194432 (D. Mass. Jan. 20, 2012).  The court determined that the remaining interviews were not within the subpoenas' scope.[9]  BC has appealed this order, and that appeal is not before this panel.  See Appeal No. 12-1236.

The American Civil Liberties Union of Massachusetts (ACLUM) has filed an amicus curiae brief in support of appellants Moloney and McIntyre.[10]

---

same reasons that it denied BC's motions.  Tr. of Mot. Hr'g at 8-11, Moloney v. Holder, No. 11-12331 (D. Mass. Jan. 24, 2012), ECF No. 18.

[8]  The court made production contingent on the lifting of the stay entered by this court on December 30, 2011.

[9]  No party raises on appeal any question whether the district court had discretion to review the materials to determine whether they fell within the scope of the subpoenas or acted within any discretion it had.

[10]  The brief states three interests: support of the First Amendment claim, expression of concern about disclosure of confidential information held by others, and an expression of concern about the government's interpretation of the US-UK MLAT.

-15-

## II.

## Dismissal of the Civil Complaint's Claims Under the US-UK MLAT and 18 U.S.C. § 3512

We review de novo the dismissal of the appellants' complaint. See Abdel-Aleem v. OPK Biotech LLC, 665 F.3d 38, 41 (1st Cir. 2012) (dismissal for lack of subject matter jurisdiction reviewed de novo); Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 532 (1st Cir. 2011) (dismissal for failure to state a claim reviewed de novo), cert. denied, 80 U.S.L.W. 3676 (U.S. June 11, 2012). We "accept[] as true all well-pleaded facts, analyz[e] those facts in the light most hospitable to the plaintiff's theory, and draw[] all reasonable inferences for the plaintiff." New York v. Amgen Inc., 652 F.3d 103, 109 (1st Cir. 2011) (quoting United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011)), cert. dismissed, 132 S. Ct. 993. We are not bound by the district court's reasoning but "may affirm an order of dismissal on any basis made apparent from the record." Cook v. Gates, 528 F.3d 42, 48 (1st Cir. 2008) (quoting McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir. 2006)).

Moloney and McIntyre essentially make several arguments of statutory error and one constitutional claim. They argue that (1) they state a claim under the US-UK MLAT and 18 U.S.C. § 3512; in any event, (2) they have a claim under the Administrative Procedure Act, 5 U.S.C. § 702, and 28 U.S.C. § 1331; and that,

-16-

regardless, (3) the district court had residual discretion which it abused in not quashing the subpoenas. They also argue that their claim under the First Amendment of the U.S. Constitution, brought under federal question jurisdiction, 28 U.S.C. § 1331, was improperly dismissed, an argument we address in part III.

Moloney and McIntyre contend they may bring suit on the claims that the Attorney General failed to fulfill his obligations under the US-UK MLAT and that they have a private right of action to seek a writ of mandamus compelling him to comply with the treaty or to seek a declaration from a federal court that he has not complied with the treaty.[11]

The appellants' claims under the US-UK MLAT fail because appellants are not able to state a claim that they have private rights that arise under the treaty, and because a federal court has no subject matter jurisdiction to entertain a claim for judicial review of the Attorney General's actions pursuant to the treaty.

---

[11] Appellants assert that the Attorney General's actions violate the US-UK MLAT because it was not reasonable to believe that a prosecution would take place in the underlying case; he failed to take into account certain "essential interests" and "public policy" in deciding whether to comply with a request under the treaty; the crimes under investigation by the United Kingdom were "of a political character;" and he did not consider the implications for the peace process in Northern Ireland of complying with the United Kingdom's request. The federal courts may not review this decision by the Attorney General.

A.          Explanation of the Treaty and Statutory Scheme

The United States has entered into a number of mutual legal assistance treaties ("MLATs") which typically provide for bilateral, mutual assistance in the gathering of legal evidence for use by the requesting state in criminal investigations and proceedings.  A description of the history and evolution of such MLATs may be found in the Ninth Circuit's decision in In re 840 140th Ave. NE, 634 F.3d 557, 563-64 (9th Cir. 2011).

The MLAT between the United States and the United Kingdom was signed on January 6, 1994, and entered into force on December 2, 1996.  See Treaty Between the Government of the United States and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters, U.S.-U.K., Dec. 2, 1996, S. Treaty Doc. No. 104-2.  In 2003, the United States signed a mutual legal assistance treaty with the European Union ("US-EU MLAT") that made additions and amendments to the US-UK MLAT; the latter is in turn included as an annex to the US-EU MLAT.  See Agreement on Mutual Legal Assistance Between the United States of America and the European Union, U.S.-E.U., June 25, 2003, S. Treaty Doc. No. 109-13.  Both MLATs are self-executing treaties.  S. Treaty Doc. No. 109-13, at vii ("The U.S.-EU Mutual Legal Assistance Agreement and bilateral instruments [including the annexed US-UK MLAT] are regarded as self-executing treaties under U.S. law . . . .").

-18-

Article 1 of the US-UK MLAT provides that the parties to the agreement shall assist one another in taking testimony of persons; providing documents, records, and evidence; serving documents; locating or identifying persons; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; identifying, tracing, freezing, seizing, and forfeiting the proceeds and instrumentalities of crime; and providing other assistance the parties' representatives may agree upon. See US-UK MLAT, art. 1, ¶ 2.

Importantly, article 1 further states: "This treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request." US-UK MLAT, art. 1, ¶ 3. This treaty expressly prohibits the creation of private rights of action.

Article 2 concerns Central Authorities: each party's representative responsible for making and receiving requests under the US-UK MLAT. US-UK MLAT, art. 2, ¶ 3. The treaty states that the Central Authority for the United States is "the Attorney General or a person or agency designated by him." US-UK MLAT, art. 2, ¶ 2.

Article 3 sets forth certain conditions under which the Central Authority of the Requested Party may refuse assistance.[12] Before the Central Authority of a Requested Party denies assistance for any of the listed reasons, the treaty states that he or she "shall consult with the Central Authority of the Requesting Party to consider whether assistance can be given subject to such conditions as it deems necessary."  US-UK MLAT, art. 3, ¶ 2.

---

[12]  Article 3, paragraph one states that

> [t]he Central Authority of the Requested Party may refuse assistance if:
>
> (a) the Requested Party is of the opinion that the request, if granted, would impair its sovereignty, security, or other essential interests or would be contrary to important public policy;
>
> (b) the request relates to an offender who, if proceeded against in the Requested Party for the offense for which assistance is requested, would be entitled to be discharged on the grounds of previous acquittal or conviction; or
>
> (c) the request relates to an offense that is regarded by the Requested Party as:
>
>> (i) an offense of a political character; or
>>
>> (ii) an offense under military law of the Requested Party which is not also an offense under the ordinary civilian law of the Requested Party.

US-UK MLAT, art. 3, ¶ 1.

In article 18, entitled "Consultation," the treaty states that

> [t]he Parties, or Central Authorities, shall consult promptly, at the request of either, concerning the implementation of this Treaty either generally or in relation to a particular case. Such consultation may in particular take place if . . . either Party has rights or obligations under another bilateral or multilateral agreement relating to the subject matter of this Treaty.

US-UK MLAT, art. 18, ¶ 1.

The requests from the United Kingdom in this case were executed under 18 U.S.C. § 3512, which was enacted as part of the Foreign Evidence Request Efficiency Act of 2009, Pub. L. No. 111-79, 123 Stat. 2086. When the US-UK MLAT was entered into, requests for assistance were to be executed under a different statute, 28 U.S.C. § 1782. See S. Exec. Rep. No. 104-23, at 13 (1996) (report of the Senate Committee on Foreign Relations accompanying the US-UK MLAT). Among other differences, § 3512 provides for a more streamlined process than under § 1782 for executing requests from foreign governments related to the prosecution of criminal offenses.[13] Enforcement of similar MLATs

---

[13] Section 1782 effectively requires the Attorney General as Central Authority to respond to requests for evidence from foreign governments by filing requests with the district court in every district in which evidence or a witness may be found. See 155 Cong. Rec. S6810 (daily ed. June 18, 2009) (letter from Acting Assistant Att'y Gen. Burton to Sen. Whitehouse). In practice this requires involving multiple U.S. Attorneys' Offices and district courts in a single case. Id. Section 3512, on the other hand, permits a single Assistant United States Attorney to pursue

-21-

under the provisions of § 1782 was the subject of consideration in In re 840 140th Ave. NE, 634 F.3d 557 (9th Cir. 2011); In re Commissioner's Subpoenas, 325 F.3d 1287 (11th Cir. 2003), abrogated in part by Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241 (2004); and In re Erato, 2 F.3d 11 (2d Cir. 1993).

B.      Appellants Have No Enforceable Rights Derived from the US-UK MLAT

Interpretation of the treaty takes place against "the background presumption . . . that '[i]nternational agreements, even those directly benefitting private persons, generally do not create rights or provide for a private cause of action in domestic courts.'" Medellín v. Texas, 128 S. Ct. 1346, 1357 n.3 (2008) (alteration in original) (quoting 2 Restatement (Third) of Foreign Relations Law of the United States § 907 cmt. a, at 395 (1986)). The First Circuit and other courts of appeals have held that "treaties do not generally create rights that are privately enforceable in the federal courts." United States v. Li, 206 F.3d 56, 60 (1st Cir. 2000) (en banc); see also Mora v. New York, 524 F.3d 183, 201 & n.25 (2d Cir. 2008) (collecting cases from ten circuits holding that there is a presumption that treaties do not create privately enforceable rights in the absence of express

---

requests in multiple judicial districts, see 18 U.S.C. § 3512(a)(1); 155 Cong. Rec. S6809 (daily ed. June 18, 2009) (statement of Sen. Whitehouse), and allows individual district court judges to oversee and approve subpoenas and other orders (but not search warrants) in districts other than their own, see 18 U.S.C. § 3512(f).

language to the contrary).  Express language in a treaty creating private rights can overcome this presumption.  See Mora, 524 F.3d at 188.

The US-UK MLAT contains no express language creating private rights.  To the contrary, the treaty expressly states that it does not give rise to any private rights.  Article 1, paragraph 3 of the treaty states, in full: "This treaty is intended solely for mutual legal assistance between the Parties.  The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request."  US-UK MLAT, art. 1, ¶ 3.  The language of the treaty is clear: a "private person," such as Moloney or McIntyre here, does not have any right under the treaty to "suppress . . . any evidence, or to impede the execution of a request."

If there were any doubt, and there is none, the report of the Senate Committee on Foreign Relations that accompanied the US-UK MLAT confirms this reading of the treaty's text:

> [T]he Treaty is not intended to create any rights to impede execution of requests or to suppress or exclude evidence obtained thereunder.  Thus, a person from whom records are sought may not oppose the execution of the request by claiming that it does not comply with the Treaty's formal requirements set out in article 3.

S. Exec. Rep. No. 104-23, at 14.

Other courts considering MLATs containing terms similar to the US-UK MLAT here have uniformly ruled that no such private right exists. See In re Grand Jury Subpoena, 646 F.3d 159, 165 (4th Cir. 2011) (subject of a subpoena issued pursuant to an MLAT with a clause identical to the US-UK MLAT's article 1, paragraph 3 "failed to show that the MLAT gives rise to a private right of action that can be used to restrict the government's conduct"); United States v. Rommy, 506 F.3d 108, 129 (2d Cir. 2007) (defendant who argued that evidence against him was improperly admitted because it was gathered in violation of US-Netherlands MLAT could not "demonstrate that the treaty creates any judicially enforceable right that could be implicated by the government's conduct" in the case); United States v. $734,578.82 in U.S. Currency, 286 F.3d 641, 659 (3d Cir. 2002) (article 1, paragraph 3 of US-UK MLAT barred claimants' argument that seizure and subsequent forfeiture of money violated the treaty); United States v. Chitron Elecs. Co. Ltd., 668 F. Supp. 2d 298, 306-07 (D. Mass. 2009) (defendant's argument that service of criminal summons was defective under US-China MLAT, which contained a clause identical to article 1, paragraph 3 of US-UK MLAT, failed because "the MLAT does not create a private right of enforcement of the treaty").

Moloney and McIntyre attempt to get around the prohibition on the creation of private causes of action with three arguments based on the treaty language. Appellants appear to argue

-24-

that the text of the US-UK MLAT only covers requests for documents in the possession of the Requested Party but not for documents held by third persons who are merely under the jurisdiction of the government which is the Requested Party. This is clearly wrong. Article 1, paragraph 2 of the treaty states that a form of assistance provided for under the treaty includes "providing documents, records, and evidence." US-UK MLAT, art. 1, ¶ 2(b). As the Senate report explains, the treaty "permits a State to compel a person in the Requested State to testify and produce documents there." S. Exec. Rep. No. 104-23, at 7.

Appellants' second argument is that article 1, paragraph 3 applies only to criminal defendants who try to block enforcement. This argument has no support in the text of the treaty. The US-UK MLAT plainly states that the treaty does not "give rise to a right on the part of <u>any private person</u> . . . to impede the execution of a request." US-UK MLAT, art. 1, ¶ 3 (emphasis added). This prohibition by its terms encompasses all private persons, not just criminal defendants.

Appellants finally contend that they do not seek to "obtain, suppress, or exclude any evidence, or to impede the execution of a request," but instead merely to enforce the treaty requirements before there can be compliance with a subpoena. Their own requests for relief make it clear they are attempting to do exactly what they say they are not.

Because the US-UK MLAT expressly disclaims the existence of any private rights under the treaty, appellants cannot state a claim under the treaty upon which relief can be granted.[14]

C.        The APA Does Not Provide a Claim for Judicial Review

Appellants attempt to circumvent the US-UK MLAT's prohibition on private rights of action by framing their suit as one of judicial review under the APA.[15]  See 5 U.S.C. § 702.

It is true that § 702 of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  Id. However, § 701(a)(1) withdraws the right to judicial review to the

_____

[14]  We reject their broader contention that the US-EU MLAT provides a basis for applying U.S. domestic law.  That treaty has a provision that reads: "The provisions of this Agreement shall not . . . expand or limit rights otherwise available under domestic law."  US-EU MLAT, art. 3, ¶ 5.  Not only is appellants' reliance on this provision question begging, it is also misplaced.  By its terms the provision applies only to the US-EU MLAT and not to any of the related bilateral agreements, such as the US-UK MLAT at issue in this case.

[15]  The government argues that Moloney and McIntyre lack prudential standing to bring their claims under the APA because their asserted interests fall outside the zone of interests meant to be protected or regulated by the US-UK MLAT.  See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, Nos. 11-246, 11-247, 2012 WL 2202936, at *9 (U.S. June 18, 2012) (describing the prudential standing test).  The zone-of-interests standing question "is an issue of statutory standing," not Article III standing. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 97 (1998). We may and do bypass the question of appellants' statutory standing and resolve the issue of whether the APA provides them with a cause of action on the merits.  See id. at 97 & n.2 (merits questions may be decided before statutory standing questions).

extent that "statutes preclude judicial review." Id. The treaty here by its express language precludes judicial review. Further, "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved" all dictate that no judicial review is available under the APA. Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984). Section 701(a)(1) thus bars federal court jurisdiction here.[16] Accord Comm. of U.S. Citizens Living in Nicar. v. Reagan, 859 F.2d 929, 943 (D.C. Cir. 1988) ("[T]he APA does not grant judicial review of agencies' compliance with a legal norm that is not otherwise an operative part of domestic law." (citing 5 Davis, Administrative Law Treatise § 28.1, at 256 (2d ed. 1984))).

---

[16] Appellants admit they cannot invoke the Declaratory Judgment Act, 28 U.S.C. § 2201, as an independent basis for jurisdiction over their claims. See Alberto San, Inc. v. Consejo de Titulares del Condominio San Alberto, 522 F.3d 1, 5 (1st Cir. 2008) (Declaratory Judgment Act "merely 'makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis.'" (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995)) (citing Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950))).

Nor are appellants entitled to a writ of mandamus under 28 U.S.C. § 1361. "Mandamus is regarded as an extraordinary writ reserved for special situations. Among its ordinary preconditions are that the agency or official have acted (or failed to act) in disregard of a clear legal duty and that there be no adequate conventional means for review." In re City of Fall River, Mass., 470 F.3d 30, 32 (1st Cir. 2006). Such clear legal duty must be "nondiscretionary." Eveland v. Dir. of Cent. Intelligence Agency, 843 F.2d 46, 51 (1st Cir. 1988) (per curiam) (quoting Heckler v. Ringer, 466 U.S. 602, 616 (1984)). Here, the plain text of article 1, paragraph 3 of the US-UK MLAT precludes any legal duty -- discretionary or nondiscretionary -- under the treaty on the part of the Attorney General to any private party.

D.          The District Court Did Not Abuse Its Discretion, in Any Event, in Denying Relief

The district court reasoned that it had discretion, under the laws of the United States, particularly 18 U.S.C. § 3512, to quash the subpoenas, and concluded that it would exercise its discretion not to do so.  The appellants, accordingly, argue that they may take advantage of that discretion and that the district court abused its discretion in not granting relief.[17]  The government in this case has chosen not to address the question of whether there is any such discretion, or, if so, the scope of it or who may invoke it.  By contrast, in a case under the US-Russia MLAT and 28 U.S.C. § 1782, the government argued that the district court

_____

[17] Appellants' reliance on Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241 (2004), fails.  Moloney and McIntyre argue that the district court should have evaluated the subpoenas by applying the discretionary factors set forth in Intel.  In that case the Supreme Court set out "factors that bear consideration in ruling on a § 1782(a) request" for the production of evidence for use in a foreign tribunal.  Id. at 264.
    The Intel factors are not applicable in this case for two reasons, whether or not § 3512 provides any residual discretion.  The request here was brought under 18 U.S.C. § 3512, not 28 U.S.C. § 1782(a).  In addition, the United Kingdom's request was made pursuant to an MLAT.  The Court developed the Intel factors to apply to a situation where 28 U.S.C. § 1782(a) provided the only substantive standards for evaluating a request, but here such substantive standards are provided by the US-UK MLAT.  See In re 840 140th Ave. NE, 634 F.3d 557, 571 (9th Cir. 2011) (MLAT requests brought pursuant to § 1782 use that statute's procedural mechanisms "without importing [its] substantive limitations"); Nanda & Pansius, Litigation of International Disputes in U.S. Courts § 17:53 ("The [MLAT] provides at least three advantages: reciprocity; the reduction (if not elimination) of the court's discretion under § 1782; and the streamlining of evidence processes.").

lacked discretion to quash the subpoena.  In re 840 140th Ave. NE, 634 F.3d at 565, 568.  The Ninth Circuit agreed with the government's position, and noted that at most the statute provides "a procedure for executing requests, but not . . . a means for deciding whether or not to grant or deny a request so made."  Id. at 570 (quoting In re Commissioner's Subpoenas, 325 F.3d at 1297) (internal quotation mark omitted).  In doing so, it agreed with the Eleventh Circuit in In re Commissioner's Subpoenas.

By contrast, here, for purposes of this appeal, the government has assumed arguendo that the district court had discretion to quash (going beyond the issue of whether the documents were responsive to the terms of the subpoenas) and has argued that the court acted properly within any discretion it may have had.  So we have no occasion to pass on these assumptions and caution that we are not deciding any of these issues.  The issues before us are more limited.

Even assuming arguendo the district court had such discretion, a question we do not address, we see no basis to upset the decision not to quash.  The district court concluded that the balance of interests favored the government.  See Order, In re: Request from the U.K., No. 11-91078 (D. Mass. Dec. 27, 2011), ECF No. 38; Findings and Order, In re: Request from the U.K., No. 11-91078, 2012 WL 194432 (D. Mass. Jan. 20, 2012).  The court's

finding that any balancing favored the government was not an abuse of discretion, assuming such discretion existed.

III.

The Constitutional Claims Were Properly Dismissed

Moloney and McIntyre's civil complaint alleged violations of their constitutional rights under the First Amendment.[18] We have jurisdiction under 28 U.S.C. § 1331.

It is undisputed that treaty obligations are subject to some constitutional limits. See Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 417 & n.9 (2003) (treaty obligations are "subject . . . to the Constitution's guarantees of individual rights"). Like the Ninth Circuit in In re 840 140th Ave. NE, we think it clear that the Constitution does not compel the consideration under the treaty of discretionary factors such as those contained in § 1782, although Congress may choose to enact some in statutes. 634 F.3d at 573.

We affirm the dismissal for failure to state a claim, after disposing of some of the government's initial arguments.

---

[18] Although the complaint alludes to a Fifth Amendment claim, based on alleged risk to appellants, no such claim is pled or briefed, and it fails. See Marrero-Rodríguez v. Municipality of San Juan, 677 F.3d 497, 501 (1st Cir. 2012) (dismissing as not properly pled a Fourth Amendment claim which was only mentioned on the first page of the complaint, and was not even pled as a claim).

-30-

A.          The Government's Standing Objections

The government attempts to short stop any analysis of whether a claim is stated by arguing that neither appellant has standing under Article III to raise a constitutional claim. Standing has both an Article III component and a prudential component.  Katz v. Pershing, LLC, 672 F.3d 64, 71-72 (1st Cir. 2012).  If the government's objections went only to prudential standing, they could easily be bypassed in favor of a decision on the merits.  Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006) (challenges to plaintiff's standing to sue "must be addressed first only if they call into question a federal court's Article III power to hear the case").

"Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2752 (2010).  At this stage, under Iqbal we credit plaintiffs' allegations of threatened harm.[19]  See Katz, 672 F.3d at 70; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  On their face, the pleadings appear to allege the requisite Article III injury that is fairly traceable to the issuance of the subpoenas and redressable by a favorable ruling.  To the extent the government

[19]  We add that the government disputes these allegations of threatened harm to appellants, which also makes any final resolution of the standing issue at this stage inadvisable.

-31-

asserts that the appellants lack prudential standing, we bypass the arguments.

B.          Failure to State a First Amendment Claim

We affirm the dismissal, as we are required to do by Branzburg v. Hayes, 408 U.S. 665 (1972).  As framed, the claim is one of violation of appellants' individual "constitutional right to freedom of speech, and in particular their freedom to impart historically important information for the benefit of the American public, without the threat of adverse government reaction."  They support this with an assertion that production of the subpoenaed interviews is contrary to the "confidentiality" they say they promised to the interviewees.  They assert an academic research privilege,[20] to be evaluated under the same terms as claims of a reporter's privilege.  See Cusumano v. Microsoft Corp., 162 F.3d 708, 714 (1st Cir. 1998) ("Academicians engaged in pre-publication research should be accorded protection commensurate to that which the law provides for journalists.").

---

[20]  The Supreme Court, for First Amendment purposes, has distinguished between "academic freedom" cases, on the one hand, involving government attempts to influence the content of academic speech and direct efforts by government to determine who teaches, from, on the other hand, the question of privilege in the academic setting to protect confidential peer review materials.  Univ. of Pa. v. EEOC, 493 U.S. 182, 197-98 (1990).  We view appellants' claim as falling into the second category.  As such, it is far attenuated from the academic freedom issue, and the claimed injury as to academic freedom is speculative.  Id. at 200.

Our analysis is controlled by Branzburg, which held that the fact that disclosure of the materials sought by a subpoena in criminal proceedings would result in the breaking of a promise of confidentiality by reporters is not by itself a legally cognizable First Amendment or common law injury. See 408 U.S. at 682, 690-91, 701. Since Branzburg, the Court has three times affirmed its basic principles in that opinion. See Cohen v. Cowles Media Co., 501 U.S. 663 (1991) (First Amendment does not prohibit a plaintiff from recovering damages, under state promissory estoppel law, if the defendant newspaper breaches its promise of confidentiality); Univ. of Pa. v. EEOC, 493 U.S. 182 (1990) (First Amendment does not give a university any privilege to avoid disclosure of its confidential peer review materials pursuant to an EEOC subpoena in a discrimination case); Zurcher v. Stanford Daily, 436 U.S. 547 (1978) (First Amendment does not provide any special protections for newspapers whose offices might be searched pursuant to a search warrant based on probable cause to look for evidence of a crime).

In Branzburg, the Court rejected reporters' claims that the freedoms of the press[21] and speech under the First Amendment, or the common law, gave them the right to refuse to testify before grand juries under subpoena with respect to information they learned from their confidential sources. The Court held that the strong interests in law enforcement precluded the creation of a

---

[21] No claim of freedom of the press is involved here.

-33-

special rule granting reporters a privilege which other citizens do not enjoy:

> Fair and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important, constitutionally mandated role in this process. On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.

408 U.S. at 690-91; accord Cohen, 501 U.S. at 669. The Branzburg Court "flatly rejected any notion of a general-purpose reporter's privilege for confidential sources, whether by virtue of the First Amendment or of a newly hewn common law privilege."[22] In re Special Proceedings, 373 F.3d 37, 44 (1st Cir. 2004). And as the Court said in Zurcher,

> Nor are we convinced, any more than we were in Branzburg, that confidential sources will disappear and that the press will suppress news because of fears of warranted searches. Whatever incremental effect there may be in this regard if search warrants, as well as

---

[22] The Branzburg Court "left open . . . the prospect that in certain situations -- e.g., a showing of bad faith purpose to harass -- First Amendment protections might be invoked by the reporter." In re Special Proceedings, 373 F.3d 37, 45 (1st Cir. 2004) (citing Branzburg v. Hayes, 408 U.S. 665, 707-08 (1972)). This suit does not fall within that premise. There is no plausible claim here of a bad faith purpose to harass.

> subpoenas, are permissible in proper circumstances, it does not make a constitutional difference in our judgment.

436 U.S. at 566 (citation omitted). As in <u>Branzburg</u>, there is no reason to create such a privilege here.

The Court rejected a similar claim of First Amendment privilege in <u>University of Pennsylvania</u>. The claim rejected there was that peer review materials produced in a university setting should not be disclosed in response to an EEOC subpoena in an investigation of possible tenure discrimination. The Court rejected the University's claims of First Amendment and of common law privilege. It also rejected a requirement that there be a judicial finding of particularized relevance beyond a showing of relevance. 493 U.S. at 188, 194.

The issue of defending against court proceedings requiring disclosure of information given under a promise of confidentiality has come up in a variety of circumstances in this circuit. Some cases involved underlying criminal proceedings as in <u>Branzburg</u>. <u>See</u> <u>In re Special Proceedings</u>, 373 F.3d 37 (1st Cir. 2004) (upholding order finding reporter in civil contempt for refusing to reveal to a special prosecutor the identity of the person who leaked a videotape in violation of a protective order entered in a criminal proceeding). One case did not invoke grand jury or government criminal investigations, but rather a request from criminal defendants. <u>United States</u> v. <u>LaRouche Campaign</u>, 841

F.2d 1176 (1st Cir. 1988) (upholding order finding television network in civil contempt for refusing to comply with criminal defendants' subpoena seeking "outtakes" of an interview with a key government witness).[23]

Two of our precedents dealt with claims of a non-disclosure privilege in civil cases, in which private parties both sought and opposed disclosure; as a result, the government and public's strong interest in investigation of crime was not an issue.  See Cusumano, 162 F.3d 708;[24] Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583 (1st Cir. 1980).

This case is closer to Branzburg itself, buttressed by University of Pennsylvania, than any of our circuit precedent.  The Branzburg analysis, especially as to the strength of the governmental and public interest in not impeding criminal investigations, guides our outcome.

The fact that a U.S. grand jury did not issue the subpoenas here is not a ground on which to avoid the conclusion that Branzburg controls.  The law enforcement interest here -- a

_____

[23]  As the Seventh Circuit recognized in McKevitt v. Pallasch, 339 F.3d 530, 532 (7th Cir. 2003), there is a circuit split on whether under Branzburg there can ever be a reporter's privilege of constitutional or common law dimensions.  This circuit has recognized such a possibility in United States v. LaRouche Campaign, 841 F.2d 1176, 1181-82 (1st Cir. 1988).

[24]  Even if Branzburg left us free, as we think it does not, to engage in an independent balancing utilizing the test articulated in our decision in Cusumano, we would still affirm, for the same reasons.

criminal investigation by a foreign sovereign advanced through treaty obligations -- is arguably even stronger than the government's interest in Branzburg itself. Two branches of the federal government, the Executive and the Senate, have expressly decided to assume these treaty obligations. In exchange, this country is provided with valuable reciprocal rights. "The federal interest in cooperating in the criminal proceedings of friendly foreign nations is obvious." McKevitt v. Pallasch, 339 F.3d 530, 532 (7th Cir. 2003). The strong interests of both the United States government and the requesting foreign government is emphasized by language in the treaty itself, which prohibits private parties from attempting to block enforcement of subpoenas. See US-UK MLAT, art. 1, ¶ 3.

The Supreme Court in Branzburg stressed that "[f]air and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government." 408 U.S. at 690. "The preference for anonymity of those confidential informants involved in actual criminal conduct is presumably a product of their desire to escape criminal prosecution, and this preference, while understandable, is hardly deserving of constitutional protection." Id. at 691. The court also commented that "it is obvious that agreements to conceal information relevant to commission of crime have very little to recommend them from the standpoint of public policy." Id. at 696.

-37-

In doing so, it relied on legal history, including both English and United States history outlawing concealment of a felony. Id. at 696-97.

Branzburg weighed the interests against disclosure pursuant to subpoenas and concluded they were so wanting as not to state a claim.[25] The opinion discussed the situation, not merely of reporters who promised confidentiality, but also of both informants who had committed crimes and those innocent informants who had information pertinent to the investigation of crimes. The interests in confidentiality of both kinds of informants did not give rise to a First Amendment interest in the reporters to whom they had given the information under a promise of confidentiality. These insufficient interests included the fear, as here, that disclosure might "threaten their job security or personal safety or that it will simply result in dishonor or embarrassment." Id. at 693. If the reporters' interests were insufficient in Branzburg, the academic researchers' interests necessarily are insufficient here.

It may be that compliance with the subpoenas in the face of the misleading assurances in the donation agreements could have some chilling effect, as plaintiffs assert. This amounts to an

---

[25] Branzburg also rejected arguments of First Amendment protection based on a notion that the press was being used as an investigative arm of the government, imposing burdens on it. 408 U.S. at 706-07.

argument that unless confidentiality could be promised and that promise upheld by the courts in defense to criminal subpoenas, the research project will be less effective.[26] Branzburg took into account precisely this risk. So did the Court in rejecting the claim in the academic peer review situation in University of Pennsylvania. See 493 U.S. at 188, 194. The choice to investigate criminal activity belongs to the government and is not subject to veto by academic researchers.

We add that this situation was clearly avoidable. It is unfortunate that BC was inconsistent in its application of its recognition of the limits of its ability to promise confidentiality. But that hardly assists the appellants' case. Burns Librarian O'Neill informed Moloney before the project commenced that he could not guarantee that BC "would be in a position to refuse to turn over documents [from the Project] on a court order without being held in contempt." In keeping with this warning, Moloney's agreement with BC directed that "[e]ach interviewee is to be given a contract guaranteeing to the extent

---

[26] McIntyre, but not Moloney, in his affidavit states that neither he nor the people he interviewed would have participated in the Belfast Project had they thought that the interviews would be subject to disclosure before their deaths and without their permission. Burns Librarian O'Neill states in his affidavit that "[h]ad the assurances of confidentiality not been made, it is doubtful that any paramilitary would have participated in this oral history project. Their stories would have died with them, and an opportunity to document and preserve a critical part of the historical record would have been lost forever."

<u>American law allows</u> the conditions of the interview and the conditions of its deposit at the Burns Library, including terms of an embargo period if this becomes necessary" (emphasis added). Despite Moloney's knowledge of these limitations, the donation agreements signed by the interviewees did not contain the limitation required to be in them by Moloney's agreement with BC.

That failure in the donation agreement does not change the fact that any promises of confidentiality were necessarily limited by the principle that "the mere fact that a communication was made in express confidence . . . does not create a privilege. . . . No pledge of privacy nor oath of secrecy can avail against demand for the truth in a court of justice." <u>Branzburg</u>, 408 U.S. at 682 n.21 (quoting 8 Wigmore, <u>Evidence</u> § 2286 (McNaughton rev. 1961)) (internal quotation marks omitted).

To be clear, even if participants had been made aware of the limits of any representation about non-disclosure, Moloney and McIntyre had no First Amendment basis to challenge the subpoenas. Appellants simply have no constitutional claim and so that portion of the complaint was also properly dismissed.[27]

---

[27] Appellants' intervention complaint raised the same claims as their separate civil complaint. We have affirmed that there is no cause of action under the treaty and under the Constitution, so there is no need for us to consider whether the district court acted within its discretion in denying appellants' motion to intervene. <u>Cf.</u> <u>In re Grand Jury Proceedings</u>, 708 F.2d 1571, 1575 (11th Cir. 1983) (per curiam) (holding that the district court's denial of a petition to intervene was harmless error because the merits of the appellant's claim were eventually considered on

IV.

We uphold the denial of the requested relief for the reasons stated and affirm.  No costs are awarded.

**-- Opinion Concurring in the Judgment Follows --**

---

appeal).

**TORRUELLA, Circuit Judge (Concurring in the judgment only).** I reluctantly concur in the judgment in this case, doing so only because I am compelled to agree that the Supreme Court in Branzburg v. Hayes, 408 U.S. 665 (1972), and subsequent cases has most likely foreclosed the relief that the Appellants in these consolidated appeals seek. I write separately to emphasize my view that, while the effect of Branzburg and its progeny is to forestall the result that the Appellants wish to see occur, none of those cases supports the very different proposition, apparently espoused by the majority, that the First Amendment does not provide some degree of protection to the fruits of the Appellants' investigative labors. Cf. Branzburg, 408 U.S. at 681. It is one thing to say that the high court has considered competing interests and determined that information gatherers (here, academic researchers) may not refuse to turn over material they acquired upon a premise of confidentiality when these are requested via government subpoena in criminal proceedings. It is entirely another to eagerly fail to recognize that the First Amendment affords the Appellants "a measure of protection . . . in order not to undermine their ability to gather and disseminate information." Cusumano v. Microsoft Corp., 162 F.3d 708, 714 (1st Cir. 1998).

"It is firmly established that the First Amendment's aegis extends further than the text's proscription on laws 'abridging the freedom of speech, or the press,' and encompasses a

-42-

range of conduct related to the gathering and dissemination of information." Glik v. Cunniffe, 655 F.3d 78, 82 (1st Cir. 2011). Confidentiality or anonymity, where prudent, naturally protects those who seek to collect or provide information. Accordingly, it is similarly well-settled that the First Amendment's protections will at times shield "information gatherers and disseminators," from others' attempts to reveal their identities, unveil their sources, or disclose the fruits of their work. See Cusumano, 162 F.3d at 714; see also McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 342 (1995) (noting "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment"); Talley v. California, 362 U.S. 60, 64 (1960) (noting City's ordinance banning distribution of handbills lacking names and addresses of authors and distributors "would tend to restrict freedom to distribute information and thereby freedom of expression"); United States v. LaRouche Campaign, 841 F.2d 1176, 1182 (1st Cir. 1988) ("We discern a lurking and subtle threat to journalists . . . if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine and casually, if not cavalierly compelled.").

The Appellants in these consolidated cases are academic researchers and, as such, axiomatically come within the scope of

these protections, as recognized by this Circuit's settled law.
See Cusumano, 162 F.3d at 714 ("The same concerns [that advise
extending First Amendment protections to journalists] suggest that
courts ought to offer similar protection to academicians engaged in
scholarly research."). It is also beyond question that the content
of the materials that the government wishes to obtain may properly
be characterized as confidential: the Appellants and the Belfast
Project's custodians have gone to great lengths to prevent their
unsanctioned disclosure. See Maj. Op. at 6-7. The question then
becomes one concerning the degree of protection to which they are
entitled. The manner in which this inquiry unfolds necessarily
depends on context, not on "semantics" -- the "unthinking
allowance" of discovery requests in these circumstances, we have
warned, will inevitably "impinge upon First Amendment rights."
Cusumano, 162 F.3d at 716 (quoting Bruno & Stillman, Inc. v. Globe
Newspaper Co., 633 F.2d 583, 595-96 (1st Cir. 1980)).
Consequently, balancing the interests on either side of such a
request is both proper and essential. See id. ("[C]ourts must
balance the potential harm to the free flow of information that
might result against the asserted need for the requested
information." (quoting Bruno & Stillman, Inc., 633 F.2d at 595-
96)).

Fortunately for this Court's panel -- but unfortunately
for the Appellants -- the Supreme Court has already done the lion's

-44-

share of the work for us.  Under the mutual legal assistance treaty between the United States and the United Kingdom, the federal government has assumed an obligation to assist the United Kingdom in its prosecution of domestic criminal matters -- here, a homicide -- to the extent permitted by U.S. law.  See UK-MLAT Technical Analysis, S. Exec. Rep. No. 104-23, at 11 (noting "MLATs oblige each country to assist the other to the extent permitted by their laws, and provide a framework for that assistance").[28]

In my view, the Appellants cannot carry the day, not because they lack a cognizable interest under the First Amendment,

---

[28] Appellants also claim that the Attorney General's actions are not in compliance with the US-UK-MLAT, among other reasons, because "the crimes under investigation by the United Kingdom were of 'a political nature.'"  Pursuant to Article 3, ¶ 1(c)(i) of the treaty the United States may refuse assistance to the United Kingdom's request if it relates to "an offense of a political nature."  Ignoring the underlying and pervasive political nature of the "Troubles," as the Irish-British controversy has come to be known in Northern Ireland, is simply ignoring one hundred years of a well-documented history of political turmoil.  These came into focus when Ireland was partitioned, and six of its Ulster counties were constituted into Northern Ireland as an integral part of the United Kingdom by virtue of the Government of Ireland Act of 1920.  See generally Northern Ireland Politics (Arthur Aughley & Duncan Morrow eds.) (1996).  That the academic investigations carried out by Appellants in this case, and the evidence sought by the United Kingdom involve "offenses of a political nature" irrespective of how heinous we may consider them, is borne out by the terms of the Belfast Agreement (also known as the "Good Friday Agreement") entered into by the Government of the United Kingdom and the Irish Republican Army, whereby almost all prisoners were released by the British government, including many who had been convicted of murder.  See Karl S. Bottigheirmer & Arthur H. Aughley, Northern Ireland, Encyclopaedia Britannica (2007).  Unfortunately for Appellants, they are foreclosed from pursuing their claim by virtue of Article 1, ¶ 3 of the treaty, which prohibits private parties from enforcing any rights thereunder.

but because any such interest has been weighed and measured by the Supreme Court and found insufficient to overcome the government's paramount concerns in the present context.

Finally, with regards to the district court's denial of the Appellants' motion to intervene as of right under Rule 24(a), I harbor doubts as to whether Boston College could ever "adequately represent" the interests of academic researchers who have placed their personal reputations on the line, exposing both their livelihoods and well-being to substantial risk in the process. Because, for the reasons explained above, I am constrained to agree that the Appellants are unable to assert a legally-significant protectable interest, as Rule 24(a) commands, see Donaldson v. United States, 400 U.S. 517, 531 (1971), any concerns I may have in that regard are regrettably moot. See Ungar v. Arafat, 634 F.3d 46, 51 (1st Cir. 2011) ("Each of [Rule 24(a)(2)'s] requirements must be fulfilled; failure to satisfy any of them defeats intervention as of right.").