# United States Court of Appeals
## For the First Circuit

No. 12-1236

IN RE: REQUEST FROM THE UNITED KINGDOM PURSUANT TO THE TREATY
BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND
THE GOVERNMENT OF THE UNITED KINGDOM ON MUTUAL ASSISTANCE
IN CRIMINAL MATTERS IN THE MATTER OF DOLOURS PRICE,

UNITED STATES OF AMERICA,

Petitioner, Appellee,

v.

TRUSTEES OF BOSTON COLLEGE,

Movant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

Before
Torruella, Boudin* and Thompson,
Circuit Judges.

Jeffrey Swope, with whom Nicholas A. Soivilien and Edwards
Wildman Palmer LLP, was on brief for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief for appellee.

May 31, 2013

---

* Judge Boudin heard oral argument in this matter and participated
in the semble, but he did not participate in the issuance of the
panel's opinion in this case. The remaining two panelists
therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

**TORRUELLA, Circuit Judge.** As part of its academic mission, Boston College ("BC"), an institution of higher learning, undertook research into the armed conflict surrounding the independence movement of Northern Ireland during the second half of the Twentieth Century. In the course of said research, which it labeled the "Belfast Project" ("Project"), BC compiled extensive oral histories in the form of personal interviews and testimonies from formerly active participants in that volatile period, including from past members of the Irish Republican Army ("IRA") and its various related organizations. Said materials are deposited in a secure section of BC's Burns Library, where they are accessible only for academic research and study, subject to strict confidentiality agreements entered into between BC and the interviewees.

On August 11, 2011, pursuant to Article 5 of the Treaty Between the Government of the United States and the Government of the Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance on Criminal Matters, U.S.-U.K., Dec. 2, 1996, S. Treaty Doc. No. 104-2 ("US-UK MLAT")[1] and 18 U.S.C. § 3512, a commissioner

---

[1] Article 5 of the US-UK MLAT states:

1. As empowered by this Treaty or by national law, or in accordance with its national practice, the Requested Party shall take whatever steps it deems necessary to give effect to requests received from the Requesting Party. The courts of the Requested Party shall have authority to issue subpoenas, search warrants, or other orders necessary to execute the requests.

-2-

appointed to represent Petitioner-Appellee the United States ("Petitioner") issued, and thereafter sought enforcement of, a subpoena (the "August 2011 subpoena") in the United States District Court for the District of Massachusetts. Said subpoena is aimed at compelling the production by BC of the recordings and/or transcripts of all interviews collected by the Project's researchers, "containing information about the abduction or death of Mrs. Jean McConville," an apparent casualty of the interstitial conflict in Northern Ireland.

BC filed a motion to quash this subpoena, seeking to preserve the confidentiality of its research. The district court denied BC's request, but agreed to perform an in camera review of the documents sought by the Petitioner. Following said review, the Court ordered that 85 interviews in BC's possession be turned over to the Petitioner for eventual transfer to the UK authorities.

BC now appeals the district court's order to produce the interviews. Relying on In re Special Proceedings, 373 F.3d 37, 45 (1st Cir. 2004), it claims that "'heightened sensitivity' to First Amendment concerns" applies and that materials in the interviews "may not be compelled unless directly relevant to a" bona fide investigation.

---

2. When execution of the request requires judicial or administrative action, the request shall be presented to the appropriate authority by the persons appointed by the Central Authority of the Requested Party.

After a detailed review of the materials in question, we find that the district court abused its discretion in ordering the production of several of the interviews which, after an in detail reading of the same, do not contain any information relevant to the August 2011 subpoena. We thus affirm in part and vacate in part the district court's order.

## I. Background

In 2012, we issued a decision in two consolidated appeals relating to the instant appeal. See In re Dolours Price, 685 F.3d 1 (1st Cir. 2012), cert. denied sub. nom. Moloney v. United States, 2013 U.S. LEXIS 2757 (U.S., Apr.15, 2013). Those appeals came about after the district court rejected the efforts of two BC researchers closely related to the Project, Ed Moloney and Anthony McIntyre, to intervene in the subpoena enforcement proceedings. We shall only recount the facts and holding of that case as is necessary to frame and decide the present appeal.

As is apparent from the record, the origins of these proceedings lay in the UK's request for Petitioner US's assistance in investigating the 1974 disappearance of Mrs. McConville from her home in Belfast, Northern Ireland. The UK seeks to scrutinize the Project's materials for information aiding that investigation, and thus requested the United States' assistance in obtaining them. In March 31, 2011, as provided in the US-UK MLAT and 18 U.S.C.

-4-

§ 3512,[2] the district court appointed a commissioner to pursue the UK's request.

Shortly thereafter, in May 2011, the commissioner served his first set of subpoenas on BC seeking the production of the interviews of two individuals who had taken part in the Project, Brendan Hughes (who by then had passed away) ("Hughes") and Dolours Price. BC filed a motion to quash those subpoenas. While that motion was pending, the commissioner served BC with another subpoena in August 2011 (the subject of the present appeal). Instead of being directed at the production of specifically named interviewees, the August 2011 subpoenas sought "[t]he original audio and video recordings" and "[a]ny and all written transcripts, interview summaries, and interview indices" "of any and all interviews containing information about the abduction or death of Mrs. Jean McConville." BC moved to quash this subpoena as well.

On December 16, 2011, the district court denied BC's requests to quash both sets of subpoenas. See United States v. Trustees of Boston College, 831 F. Supp. 2d 435 (D. Mass. 2011). It did, however, grant BC's alternative request to conduct an in camera review. On December 27, 2011, after reviewing the Dolours Price interviews, the district court ordered their production. BC

---

[2]  18 U.S.C. § 3512 establishes "a streamlined process . . . for executing requests from foreign governments related to the prosecution of criminal offenses." In re Dolours Price, 685 F.3d at 11, n.13.

has since handed over both the Dolours Price and Hughes materials to the commissioner. The district court also conducted an in camera review of the August 2011 subpoenaed materials "to see whether, fairly read, they f[e]ll within the scope of the subpoena." It declined to consider whether a materiality or relevance analysis was necessary and found that the judicial role was circumscribed to "checking to see whether the data produced conforms to the subpoena."

On January 27, 2012, the district court issued a Findings and Order in which it summarily explained how it conducted its in camera review. The Order included a Sealed Appendix listing the specific materials to be produced. The list identified the materials according to BC's coding system, using random letters and numbers to identify the interviewee and the interview number to be released. It neither explained why it ordered particular interviews to be released, nor why it ordered the production of all interviews by a given interviewee. In some cases it ordered the whole series of interviews conducted with a particular interviewee to be produced while in other cases only one interview from the series was ordered released. Before us now is BC's appeal from that order.

While the present appeal was pending, BC filed a Suggestion of Death pursuant to Fed. R. App. P. 43(a)(1), informing this court that, "[a]ccording to news reports, Dolours Price was

found dead on January 23, 2013, at her home in Malahide, Northern Ireland."  In asking the court to take notice of her death, BC also requested that we vacate the district court's order to produce the August 2011 subpoenaed materials, dismissing this appeal as moot. Its main argument was that since the subject of the case, as identified in its caption, was Dolours Price, her death meant that criminal matters in relation to her could not continue.

The government opposed BC's request.  It argued that the subpoenas requested materials relating to the abduction and death of McConville, "which very well might include interviews implicating persons other than Price," and that the parties and the district court understood that the subpoenas sought "documents relevant to the investigation of McConville's death, not merely those that might implicate Price."  BC rejected this argument, differentiating between the subject of the proceedings as identified in the caption (i.e., Dolours Price) and the scope of the materials sought by the subpoenas (i.e., information about the McConville abduction and death).[3]

We will first address BC's mootness argument.

---

[3]  The United States captioned the special proceeding as: "In re: Request from the United Kingdom Pursuant to the Treaty Between the Government of the United States of America and the Government of the United Kingdom on Mutual Assistance in Criminal Matters in the Matter of Dolours Price."  BC also made an argument under Article 1 of the US-UK MLAT, but later decided not to contest the United States' take on the issue.  We, of course, pass no judgment upon the merits of the abandoned argument.

## II. <u>Analysis</u>

### A. The Impact of Dolours Price's Death

It is not surprising that BC attributes great significance to the death of Dolours Price given that she evidently was targeted as part of the investigation into Mrs. McConville's apparent abduction, murder and disappearance. Dolours Price's death, however, does not have any decisive effect upon these proceedings because their subject matter is not, and has never been, solely Dolours Price's individual prosecution. Rather, these proceedings are a part of a broad investigation into the death of Mrs. McConville. This has been clear to the district court since the inception of the case, and to BC, at least since the August 2011 subpoena was issued. The materials filed under seal by the United States in the district court verify that these proceedings are based on a broad investigation, and not solely on an investigation against Dolours Price's actions. Thus, her death does not in any manner impinge or prevent the continuation of the broader investigation into Mrs. McConville's death.

BC's arguments regarding mootness seem to be partially based on the fact that the caption of the case indicates that the subject of the proceedings is a criminal investigation against Dolours Price. This argument is not well-founded. It is a settled principle that a defective caption (or even its absence) presents an issue of form that is not deemed fatal to an otherwise valid

action.  See 5A Wright and Miller, Fed. Prac. and Proc.: Civ. § 1321 at 388 (3d ed.) (2008).  Stated otherwise, it is a matter of form without substance.  In the past, in order to determine the capacity in which a defendant was sued in a civil action, this court has looked beyond a defective caption and instead examined the substance of the legal claim and the conduct of the parties.  Indianapolis Life Ins. Co. v. Herman, 516 F.3d 5 (1st Cir. 2008) (affirming personal liability even though the caption in district court and final judgment referred to defendant only in her capacity as trustee).  While the defect in the instant case involves an inaccurate caption rather than a failure to properly name a party, an analysis of the substance of these proceedings demonstrates that their subject is not the criminal prosecution of Dolours Price.  "This approach eschews mechanical reliance on the form of the caption . . . and is consistent with the practical approach to construction of pleadings and orders taken by the Federal Rules."  Id. at 10.  It is therefore of no consequence that the caption names her, a person whose involvement in the McConville abduction and death was apparently known, instead of describing the subject matter of the investigation explicitly.

**B.  The Arguments on Appeal**

Citing Branzburg v. Hayes, 408 U.S. 665 (1972), this court in In re Dolours Price, inter alia, rejected Moloney and McIntyre's attempt to halt the production of Project materials

based on allegations of First Amendment academic research privilege.[4] In particular, we held that "the fact that disclosure of the materials sought by a subpoena in criminal proceedings would result in the breaking of a promise of confidentiality by reporters [or researchers] is not by itself a legally cognizable First Amendment or common law injury." In re Dolours Price, 685 F.3d at 16 (citing Branzburg, 408 U.S. at 682, 690-91, 701). In expounding that Branzburg fully applied, this court deemed controlling the strong public and governmental interests of the United States and the UK, respectively and jointly, in not impeding criminal investigations. See id. at 18. This court further recognized that the law enforcement interest in this context is stronger than that in Branzburg given that "[t]wo branches of the federal government, the Executive and the Senate, have expressly decided to assume the[] treaty obligations." Id.

In its opening brief here, which was filed before In re Dolours Price was decided, BC explicitly stated that it did not purport to argue that there is an absolute First Amendment right that protects all academic research from compelled discovery.

---

[4] In In re Dolours Price, we rejected Moloney and McIntyre's attempt to halt the production of the materials by arguing that the terms of the US-UK MLAT had not been followed. We also denied the validity of their allegations to the effect that a cause of action existed under the Administrative Procedure Act, a contention expressly prohibited by the treaty, which denies private rights of action arising from the violation of its terms. See US-UK MLAT, Art. 1, ¶ 3.

Instead, it posited that our precedent requires that special protection be given to the Project's materials.

In its reply brief, which was filed after In re Dolours Price was issued, BC explicitly acknowledges that "many of the arguments it advanced in its opening brief were not accepted by this court in [In re Dolours Price]," but insists that special protection, in the form of "heightened sensitivity," is warranted. Further, it maintains that our precedent mandating said treatment, particularly In re: Special Proceedings, 373 F.3d 37 (1st Cir. 2004), has not been overturned and governs the outcome of this appeal. Relevant to this inquiry, BC further urges this court to decide whether a district court has discretion to quash a subpoena issued pursuant to the US-UK MLAT, a question we specifically declined to address in In re Dolours Price. See In re Dolours Price, 685 F.3d at 14-15. BC thus requests that we now pass on this issue and rule that such discretion exists; that a heightened sensitivity standard should be applied here because of the confidential nature of the Project; and that only materials that are directly responsive to the subpoenas should be released. BC specifically argues that the district court did not apply the "directly relevant" inquiry properly, even though it purported to follow In re Special Proceedings, and that it ordered the production of materials that were not responsive to the August 2011 subpoena at all.

The government, for its part, contends that courts do not have discretion under the US-UK MLAT to review for relevance materials subject to a subpoena. It states that only the Attorney General, not the courts, has discretion to decline, delay or narrow a request under the treaty. To the extent courts retain discretion, it says in the alternative, they are limited to circumstances where enforcement would offend constitutional guarantees or federally-recognized privileges. The government, however, despite the fact that it denies the district court had discretion to perform the in camera review, does not wish to upset the district court's order. Rather, it proposes that an ordinary relevance standard be applied in this case rather than a direct relevance standard, and urges us to find that the district court's review properly met that standard.

It is clear that BC has abandoned most of the arguments it made in its opening brief due to our decision in In re Dolours Price. What is left of those arguments requires us to determine whether the district court had discretion to rule upon the motion to quash and to perform an in camera review of the subpoenaed materials as part of its deliberation process. If we find that no discretion exists, we need go no further. If, however, we conclude that such discretion exists, we must then decide under which standard the district court should have examined the materials in

-12-

its exercise of discretion: direct relevance or ordinary relevance. We address first whether discretion exists at all.

## C.  Federal Court Discretion to Quash US-UK MLAT-Issued Subpoenas

As stated above, in In re Dolours Price, we explicitly declined to pass judgment upon the question of federal court discretion to review motions to quash subpoenas under the US-UK MLAT.[5]  We now address this question directly.

Pursuant to Article 3 of the US-UK MLAT, it is the Attorney General who decides whether to accede to a request from the UK, to narrow compliance to a certain aspect of said request or to decline to cooperate altogether.  See Art. 3, US-UK MLAT.  The government, however, erroneously concludes that the Attorney General's exclusive prerogative in initiating proceedings translates into a general bar on judicial oversight of the subpoena enforcement process.

The treaty is silent as to the role of federal courts in the process of enforcing subpoenas issued in furtherance of a request by the UK.  This silence, of course, does not mean that the actions taken by the Executive once the Attorney General decides to

---

[5]  On that occasion, the government assumed arguendo that the discretion to quash existed and that the court acted properly within it.  See In re Dolours Price, 685 F.3d at 14-15.  This is in sharp contrast to what the government had argued unsuccessfully in another case involving an MLAT where it denied such discretion existed.  See In re 840 140th Ave. NE, 634 F.3d 557, 563 (9th Cir. 2011).  In the appeal before us now, the government has again changed its position.

comply with a request are totally insulated and beyond the purview of oversight by the courts. In fact, courts play a prominent role in aiding the Executive's administration of its obligations under the treaty. See 18 U.S.C. § 3512.[6] In most cases, as here, the Attorney General will request that a federal judge issue an order appointing a commissioner to carry out specific actions in furtherance of the request, and will ask a court to enforce subpoenas when the recipients refuse to comply. See § 3512(a)(2) and (b). Hence, even if a court is not free to decline, delay or narrow a request by the UK because that power to initiate the process lies with the Attorney General under the treaty, federal courts play an indispensable role in the process of executing a request. Nevertheless, Section 3512, does not, on its face,

---

[6]  18 U.S.C. § 3512(a)(1) states:

> Upon application, duly authorized by an appropriate official of the Department of Justice, of an attorney for the Government, a Federal judge may issue such orders as may be necessary to execute a request from a foreign authority for assistance in the investigation or prosecution of criminal offenses, or in proceedings related to the prosecution of criminal offenses, including proceedings regarding forfeiture, sentencing, and restitution.

Although not decisive in the present appeal, we note that in enacting this provision Congress used the term "may," which usually denotes a modicum of discretion, rather than the mandatory "shall." See López v. Davis, 53 U.S. 230, 240 (1997)("Congress' use of the word 'may,' rather than 'shall,' has no significance" if interpreted as an authorization and a command, rather than as a grant of discretion.").

-14-

provide us with an answer to the inquiry at hand: whether federal courts have discretion to quash a subpoena in this context.

In the context of the issues raised by this appeal, judicial enforcement of the August 2011 subpoena implicates structural principles of the separation of powers which are "concerned with the allocation of official power among the three co-equal branches of our Government." Clinton v. Jones, 520 U.S. 681, 699 (1997); see also Boumediene v. Bush, 553 U.S. 723, 742 (2008) ("The Framers' inherent distrust of governmental power was the driving force behind the constitutional plan that allocated powers among three independent branches. This design serves not only to make Government accountable but also to secure individual liberty."). Of course, it goes without saying that the separation of powers does not forbid cooperation and interdependence between branches. See Mistretta v. United States, 488 U.S. 361, 381 (1989). But there are certain core boundaries that need to be respected and observed. See In re 840 140th Ave. NE, 634 F.3d at 571-72 (9th Cir. 2011).

In In re 840 140th Ave. NE, a case that concerned the nature and scope of judicial review in the context of the US-Russia MLAT, which we cited in In re Dolours Price with approval, the Ninth Circuit observed that the "enforcement of a subpoena is an exercise of judicial power," and that "[t]reaties, like statutes, are subject to constitutional limits, including the separation of

-15-

powers." Id. at 571-72. The Ninth Circuit further ruled that prohibiting judicial discretion to quash leads to the "the inescapable and unacceptable conclusion that the executive branch [] would exercise judicial power" and that "the government's position suggests that by ratifying an MLAT, the legislative branch could compel the judicial branch to reach a particular result -- issuing orders compelling production and denying motions for protective orders -- in particular cases, notwithstanding any concerns, such as violations of individual rights, that a federal court may have." Id. at 572 (emphasis added).

In deciding the role of federal courts in enforcing subpoenas issued pursuant to the treaty, we must ensure that our decision does not offend basic separation of powers principles by allowing (1) "encroachment or aggrandizement of one branch at the expense of the other," Jones, 520 U.S. at 699 (quoting Buckley v. Valeo, 424 U.S. 1, 122 (1976)); or (2) "a branch . . . [to] impair another in the performance of its constitutional duties," Jones, 520 U.S. at 701 (quoting Loving v. United States, 517 U.S. 748, 757 (1996)). If we were to accede to the government's position and hold that courts must always enforce a commissioner's subpoenas, we would be (1) allowing the executive branch to virtually exercise judicial powers by issuing subpoenas that are automatically enforced by the courts; and (2) impairing our powers by acceding to act as rubber stamps for commissioners appointed pursuant to the

-16-

treaty. Such subservience is constitutionally prohibited and, _ergo_, we must forcefully conclude that preserving the judicial power to supervise the enforcement of subpoenas in the context of the present case, guarantees the preservation of a balance of powers.

Precisely because we recognize the importance here of "the governmental and public interest in not impeding criminal investigations," we must necessarily recognize the importance of judicially checking and balancing these interests in order to control excesses and preserve the balance in the symbiotic relationship between the commissioner conducting the investigation on behalf of the UK, and the courts before which the commissioner seeks the enforcement of the subpoenas. In re Dolours Price, 685 F.3d at 18.

In substance, we rule that the enforcement of subpoenas is an inherent judicial function which, by virtue of the doctrine of separation of powers, cannot be constitutionally divested from the courts of the United States. Nothing in the text of the US-UK MLAT, or its legislative history, has been cited by the government to lead us to conclude that the courts of the United States have been divested of an inherent judicial role that is basic to our function as judges. Cf. Weinberger v. Romero-Barceló, 456 U.S. 305, 320 (1982).

## D. The applicable standard of relevancy

Having unequivocally established that courts have inherent judicial power over the enforcement of subpoenas issued in the context of a proceeding pursuant to the US-UK MLAT, we must decide whether, when dealing with a motion to quash the release of academic research materials, courts must review under an ordinary relevance or a direct relevance standard.

BC contends that a direct relevance standard should apply because in In re Special Proceedings we "held that 'heightened sensitivity' is required in reviewing confidential academic research materials to determine that they are 'directly relevant.'" We reject BC's argument because In re Special Proceedings applies only to cases not already covered by Branzburg.

In In re Special Proceedings, we emphasized that our three leading cases regarding confidential sources "require 'heightened sensitivity' to First Amendment concerns and invite a 'balancing' of considerations (at least in situations distinct from Branzburg)." 373 F.3d at 45 (emphasis added) (citing Cusumano v. Microsoft Corp., 162 F.3d 708 (1st Cir. 1998); United States v. LaRouche Campaign, 841 F.2d 1176 (1st Cir. 1988); Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583 (1st Cir. 1980)). We thus stated that, "[i]n substance, these cases suggest that[, 'at least in situations distinct from Branzburg,'] the disclosure of a reporter's confidential sources may not be compelled unless

directly relevant to a nonfrivolous claim or inquiry undertaken in good faith . . . ." Id.

In In re Dolours Price we stated, however, that the controversy at hand is "closer to Branzburg itself, buttressed by [Univ. of Pa. v. EEOC, 493 U.S. 182 (1990)], than any of our circuit precedent" and that "[t]he Branzburg analysis, especially as to the strength of the governmental and public interest in not impeding criminal investigations, guides our outcome." In re Dolours Price, 685 F.3d at 18.

The result of this appeal is thus dictated by binding Supreme Court and circuit precedent, namely, Branzburg and In re Dolours Price. BC has not requested that we reconsider our recent decision and we see no reason to do so, nor could we as a panel. See United States v. Rodríguez, 527 F.3d 221, 224 (1st Cir. 2008) ("As a general rule, newly constituted panels in a multi-panel circuit are bound by prior panel decisions closely on point."). Because this case is controlled by Branzburg, we need not follow our line of cases which "[i]n substance . . . suggest that the disclosure of . . . confidential sources may not be compelled unless directly relevant" to the investigation. In re Special Proceedings, 373 F.3d at 45.

Instead, we will follow Branzburg in ordering that materials relevant to the August 2011 subpoena be produced under an ordinary standard of relevance. We emphasize that Branzburg held

that the public need for information <u>relevant</u> to a <u>bona fide</u> criminal investigation precludes the recognition of a First Amendment privilege not available to the ordinary citizen. <u>See</u> <u>Branzburg</u>, 408 U.S. at 685 ("[N]ewsmen are not exempt from the normal duty of appearing before a grand jury and answering questions <u>relevant</u> to a criminal investigation.") (emphasis added). The subpoenas in <u>Branzburg</u> were thus justified because the "grand juries [did not] attempt to . . . forc[e] wholesale disclosure of names and organizational affiliations for a purpose that was not <u>germane</u> to the determination of whether crime has been committed . . . ." <u>Id.</u> at 700 (emphasis added). It was precisely the relevance of the information sought to the investigation that justified the public's need for it and, ultimately, the Court's holding. <u>Id.</u> ("Nothing in the record indicates that these grand juries were 'probing at will and without <u>relation</u> to existing need.'") (emphasis added) (brackets in original omitted).

The Supreme Court has also explicitly rejected a requirement of particularized relevancy in <u>University of Pennsylvania</u>. <u>See</u> <u>Univ. of Pa.</u>, 493 U.S. at 191 ("[W]hen a court is asked to enforce a . . . subpoena, its responsibility is to 'satisfy itself that the charge is valid and that the material requested is 'relevant' . . . .'"); <u>see also</u> <u>In re Dolours Price</u>, 685 F.3d at 17 ("[In <u>University of Pennsylvania</u> the Supreme Court] also rejected a requirement that there be a judicial finding of

-20-

particularized relevance beyond a showing of relevance." (citing Univ. of Pa., 493 U.S. at 188, 194)).

In the investigatory context, "ordinary relevance" embodies a broad reading of the concept of "relevance." Dow Chemical Co. v. Allen, 672 F.2d 1262, 1268 (7th Cir. 1982) ("The bounds of relevance . . . tend to be broader in the investigatory context."). In this context, "ordinary relevance" is the same as "pertinence." Thus, all materials relevant to the August 2011 subpoena (i.e. "the abduction and death of Mrs. Jean McConville") are entitled to be produced.

Before moving forward, it is important to clarify that the phrase "at least in situations distinct from Branzburg" in In re Special Proceedings, 373 F.3d at 45, does not stand for the proposition that only cases distinct from Branzburg require the application of a balancing test. A balancing of First Amendment concerns vis-à-vis the concerns asserted in favor of the compelled disclosure of academic and journalistic information is the law in this circuit for all First Amendment cases and, as explained in our analysis above, "at least in situations distinct from Branzburg," there is room for courts to require direct relevance. In fact, in Branzburg, the Supreme Court indeed performed, albeit sub silentio, a balancing test in evaluating the First Amendment challenge raised by the reporters. See Branzburg, 408 U.S. at 705 (balancing the recognition of a newsman privilege against the impact such

-21-

recognition would have on the courts, which would "be[come] embroiled in preliminary factual and legal determinations" whenever a reporter was subpoenaed); see also id. at 710 (Powell, J. concurring) (a "claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these . . . interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions."). In fact, in In re Dolours Price we pointed out that "Branzburg weighed the interests against disclosure pursuant to subpoenas and concluded they were so wanting as not to state a claim." 685 F.3d at 18. After Branzburg, the Supreme Court continued to engage in balancing tests in the context of First Amendment challenges brought in academic contexts. See Univ. of Pa., 493 U.S. at 200 (academic interests were "remote[,] . . . attenuated . . . [and] speculative" and did not overcome the interests in favor of disclosure).

Furthermore, Branzburg has not hindered our duty to perform balancing tests in First Amendment cases, as evidenced by Bruno & Stillman, where we stated that in Branzburg and Herbert v. Lando, 441 U.S. 153 (1979), "the First Amendment concerns articulated by the parties asserting privileges were in fact taken into consideration by the Court, but found to be outweighed in the contexts of those cases. This kind of fact-sensitive approach

-22-

comports with the shifting weights of the competing interests." Bruno & Stillman, 633 F.2d at 595. Also, in Cusumano we stated that, "when a subpoena seeks divulgement of confidential information compiled by a journalist or academic researcher in anticipation of publication, courts must apply a balancing test." Cusumano, 162 F.3d 716. Even in In re Dolours Price, we performed a balancing test to evaluate the First Amendment challenge, yet found Branzburg to be controlling precedent. See In re Dolours Price, 685 F.3d at 18 ("The Branzburg analysis, especially as to the strength of the governmental and public interest in not impeding criminal investigations, guides our outcome.").

We now turn to the review of the subpoenaed materials, keeping in mind that a finding of relevance is an evidentiary finding we review for abuse of discretion. Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 23 (1st Cir. 2011) ("The standard of review concerning a claim of privilege depends on the particular issue. Questions of law are reviewed de novo, findings of fact for clear error, and evidentiary determinations for abuse of discretion.") (citing Cavallaro v. United States, 284 F.3d 236, 245 (1st Cir. 2002)).

**E. The August 2011 Subpoenaed Materials**

The district court performed an in camera review of more than 170 interviews of 24 interviewees. Those interviews were provided to the court by BC after it performed an initial search of

the Project's archives using search terms the government had provided. As previously indicated, the district court then ordered produced 85 interviews belonging to 8 interviewees. BC challenges the order in relation to the production of all interviews, except for one interview from one interviewee, which it concedes was correctly ordered produced.

After carefully reviewing each of the materials in question, we find that although a number of interviewees provide information relevant to the subject matter of the subpoena and that the district court acted within its discretion in ordering their production, it abused its discretion in ordering the production of a significant number of interviews that only contain information that is in fact irrelevant to the subject matter of the subpoena.

Before properly stating the result of our review of the materials we must note that in cases involving criminal investigations such as this, many of the factual particularities that inform a court's understanding of the case are contained in ex parte sealed materials. Although these materials do not expand the subject matter of the subpoena beyond its terms, they provide valuable information to a court that cannot be publicly vented in order to preserve the integrity of the investigation. The following analysis, therefore, will be devoid of almost all factual detail in order to preserve the integrity of the investigation.

**1. Interview No. 3 with "P"**

BC informed the court before it issued its January 20, 2012 Findings and Order, that BC had mistakenly labeled three different interviews as "Interview 01 with Interviewee R" on their cover page, when in fact only one was "Interview 01 with R," another was "Interview 03 with R," and yet another was "Interview 03 with P," as could be surmised from the first paragraph of each transcript (as opposed to the cover page which contained the error). The court nonetheless ordered the release of all interviews labeled on their cover pages as belonging to "R." It stated in a footnote that "[t]hree interviews with 'R,' all denominated No. 1, have been reviewed. All are to be produced." We must therefore presume that the district court found that "P's" interview contained materials responsive to the subpoena.

A review of interview 3 with "P" reveals that the district court should not have ordered it produced given that it does not contain any information relevant to the subject matter of the subpoena.

**2. Interviews with "R"**

The district court ordered the production of the 17 interviews comprising the entire series with "R." The district court did not explain why it ordered the entire series produced.

Our analysis of the "R" interviews reveals that only two interviews, 13 and 14, contain information relevant to the subject

matter of the subpoena. The other fifteen interviews by "R" contain nothing relevant to the subject matter of the subpoena under an ordinary relevance standard and should not have been ordered produced.

### 3. Interviews 7 with "D" and 4 with "K"

The district court ordered produced two interviews from two different interviewees because it found, as it explained in its January 20, 2012 Findings and Order, that they "mention a shadowy sub-organization within the Irish Republican Army that may or may not be involved in the incident (the time period and the geographical location within Northern Ireland are generally congruent with the incident)." The district court then expressed that it was "virtually inconceivable" that the UK did not already know the information," but that it was reticent to substitute its judgment for that of law enforcement.

We have reviewed both interviews and find that the district court did not abuse its discretion in ordering them produced since they contain information relevant to the subject matter of the subpoena. The district court was correct in concluding that even if the UK already had the information, the materials were still relevant to the subpoena and should be ordered produced.

## 4. Interviews with "A"

The district court ordered the production of two interviews in which "A" had provided answers to questions where the interviewer specifically inquired about Mrs. Jean McConville. The district court also ordered the production of eight other interviews by the same interviewee even though they did not contain information relevant to the subpoena. The district court did not explain the reasoning behind its decision to order the production of the entire series of interviews by interviewee "A."

After reviewing the interviews, we find that the district court abused its discretion in ordering the production of the eight interviews with "A" in which the death of Mrs. Jean McConville was not mentioned at all by either the interviewer or by "A," and which contain no relevant information relevant to the inquiry in question by the subpoena. The fact that "A" responded to questions about the McConville death does not automatically make his or her entire contribution to the Project relevant to the investigation.

We thus find that only interviews 2 and 5 with "A" should be produced.

## 5. Interviews with "S"

The district court ordered the production of two interviews with "S," interviews 1 and 2. After carefully scrutinizing both, we deem that only interview 2 should have been ordered released because it contains information relevant to the

subpoena.  Interview 1 does not contain any information that could reasonably be deemed relevant.

### 6. Interviews with "Y"

The district court ordered BC to hand over 11 interviews with "Y."  We have also carefully reviewed these materials and find that only interviews 4 and 10 contain information relevant to the subpoena.  The other interviews do not contain any information relevant to the subject matter of the subpoena: "the abduction and death of Mrs. Jean McConville."

### 7.  Interviews with "Z"

The district court ordered the production of 42 interviews with "Z."  After reviewing these interviews we find that only interviews 11 and 42 contain information relevant to the subject matter of the subpoena.  The fact that such information is found in two specific interviews does not automatically turn the other 40 interviews by "Z" into materials that are relevant to the subject matter of the subpoena.  "Z" provided scores of information relating to events spanning several decades.  Only the interviews containing information relevant to the subject matter of the subpoena should be properly released.  The rest of the interviews contain nothing that could be reasonably considered relevant, and are indeed, irrelevant.

### III. Conclusion

For the reasons set forth above, the district court's order denying the motion to quash filed by BC and its order to release 85 interviews is affirmed in part and reversed in part. We thus affirm the order to turn over the following interviews: interviews 13 and 14 with "R," interview 7 with "D," interview 4 with "K," interviews 2 and 5 with "A," interview 2 with "S," interview 4 and 10 with "Y" and interviews 11 and 42 with "Z." The order is reversed as to the other interviews, which need not be released. The case is hereby remanded for the continuation of the proceedings consistent with this opinion.

**Affirmed in part, Reversed in part, and Remanded.** No costs are awarded.